*United Insurance Company of America and the Reliable Life Insurance Company v. the Maryland Insurance Administration, et al.*, No. 101, September Term, 2015. Opinion by Hotten, J.

**INSURANCE LAW — RETROACTIVE ENFORCEMENT — ADMINISTRATIVE EXHAUSTION REQUIREMENT** — Court of Appeals held that the administrative remedy afforded by the Insurance Article was primary, and thus, Petitioners were required to pursue and exhaust administrative remedies in challenging the constitutionality and retroactive enforcement of a newly-enacted insurance statute before seeking a declaratory judgment in the circuit court. Petitioners failed to rebut the presumption that the administrative remedy was primary because the Insurance Article provided a comprehensive remedial scheme that encompassed Petitioners' claim, and Petitioners' claim depended upon the statutory scheme and the expertise of the administering agency, the Maryland Insurance Administration. The Court further held that Petitioners' claim did not fall within the constitutional exception to the administrative exhaustion requirement, because Petitioners did not challenge the constitutionality of the statute as a whole, but only as applied retroactively to their in-force life insurance policies.

Circuit Court for Anne Arundel County
Case No. 02-C-13-179785
Argued: June 1, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 101

September Term, 2015

_____

UNITED INSURANCE COMPANY OF
AMERICA and THE RELIABLE LIFE
INSURANCE COMPANY

v.

THE MARYLAND INSURANCE
ADMINISTRATION, AND AL REDMER,
JR., IN HIS OFFICIAL CAPACITY AS
COMMISSIONER

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Battaglia, Lynne A.
    (Retired, Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed:   August 25, 2016

We consider whether a party who challenges the constitutionality and retroactive effect of a newly-enacted Maryland statute must pursue and exhaust administrative remedies before seeking declaratory relief in the circuit court. Petitioners, United Insurance Company of America and the Reliable Life Insurance Company, insurance providers in the State of Maryland, filed a declaratory action against Respondents, the Maryland Insurance Administration, et al., ("MIA") in the Circuit Court for Anne Arundel County, challenging the retroactive enforcement of Md. Code (2011 Repl. Vol., 2015 Supp.) § 16-118 of the Insurance Article ("Ins."). Section 16-118 imposes a duty on an insurer who "issues, delivers, or renews a policy of life insurance or an annuity contract . . ." in the State to "perform a comparison of [their] in-force life insurance policies, annuity contracts, and retained assets accounts against the latest version of a death master file to identify any death benefit payments that may be due. . . ." on a regular or semi-annual basis. Ins. § 16-118(c)(1)-(2)(i). Prior to this legislation, insurers were under no obligation to research whether a policyholder had died, and the statute did not indicate whether its provisions apply retroactively to existing insurance policies.

The circuit court dismissed Petitioners' action based on the failure to exhaust administrative remedies afforded by the Insurance Article. In an unpublished opinion, the Court of Special Appeals agreed, and affirmed the judgment of the circuit court. *United Insurance Company of America et al. v. Maryland Insurance Administration et al.*, No. 0020, Sept. Term 2014, 2015 WL 5968833 (Md. Ct. Spec. App. Oct. 14, 2015). Thereafter, we granted certiorari. For the reasons that follow, we shall affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### Petitioners' in-force life insurance policies

Petitioners offer life insurance policies to lower income individuals and families in the State of Maryland. The policies are subject to extensive regulation by the MIA, the agency that administers and regulates the State's insurance market. As of December 2011, Petitioners retained a combined total of approximately 135,000 in-force policies in the State. The average face value of the policies was $5,000, with average monthly premiums of approximately $7.00. Petitioners calculated premium rates through a process that relies upon actuarial assumptions of an insured's life expectancy, the timing and frequency of claims payments, the anticipated rate of return on invested assets, and financial projections concerning anticipated administrative costs incurred during the policy benefit period.

The policies provided that insurance proceeds would be paid upon "receipt of due proof of death" of the insured. Specifically, United Insurance Company of America's policies defined "due proof of death" as "a certified copy of the death certificate, a certified copy of a decree of a court of competent jurisdiction as to the finding of death or any other proof satisfactory to [the insurer]." Petitioners' premium rates reflected costs savings realized by placing the obligation on beneficiaries to provide proof of death.

### The enactment of § 16-118 of the Insurance Article

Maryland Senate Bill 77 (2012) was passed by the General Assembly, signed into law as § 16-118 of the Insurance Article, and became effective on October 1, 2013. The bill was introduced in response to the growing concern of questionable and unfair settlement practices by major life insurance companies, which allegedly often led to

- 2 -

"unknowing beneficiaries of life insurance policies" missing timely receipt of the settlements owed.[1]  *See Testimony of Senator Delores G. Kelley on Senate Bill 77—Life Insurance and Annuities—Unfair Claim Settlement Practices—Failure to Cross-Check Death Master File Before the Senate Finance Committee on January 26, 2012*, 430th Sess. (2012).  The relevant provisions of Ins. § 16-118 provide:

**Duty of insurer to perform comparison of life insurance policies, annuity contracts, and retained asset accounts**

> (c)(1) An insurer that issues, delivers, or renews a policy of life insurance or an annuity contract in the State shall perform a comparison of the insurer's in-force life insurance policies, annuity contracts, and retained asset accounts against the latest version of a death master file[2] to identify any death benefit payments that may be due under the policies, contracts, or retained asset accounts as a result of the death of an insured, annuitant, or retained asset account holder.
>
> (2) An insurer shall perform the comparison required under paragraph (1) of this subsection:

---

[1] Ins. § 16-118 is based on a model act adopted in 2011 by the National Conference of Insurance Legislators ("NCOIL"), an organization of state legislators that focuses primarily on insurance legislation and regulation.  It is estimated that over one billion dollars in death benefits are held by insurance companies and unclaimed by the beneficiaries of deceased policy holders. *See State ex rel. Perdue v. Nationwide Life Ins. Co*., 236 W. Va. 1, 21, 777 S.E.2d 11 (2015) (Ketchum, J. concurring) (citing Devin Hartley, *A Billion Dollar Problem: The insurance industry's widespread failure to escheat unclaimed death benefits to the states*, 19 Conn. Ins. L.J. 363 (2012–2013)).

[2] A "[d]eath master file" is defined as "the Social Security Administration's Death Master File" or "any other database or service that is at least as comprehensive as the Social Security Administration's Death Master File for determining that an individual reportedly has died." Ins. § 16-118(a)(3)(i)-(ii).  The Social Security Administration's Death Master File is an "electronic database that contains [the agency's] records of Social Security Numbers (SSN) assigned to individuals since 1936, and includes, if available, the deceased individual's SSN, first name, middle name, surname, date of birth, and date of death." *Requesting the Full Death Master File (DMF)*, SSA.GOV, https://www.ssa.gov/dataexchange/request_dmf.html (last visited June 29, 2016).

(i) at regular intervals, on at least a semiannual basis; and

(ii) in good faith, using criteria reasonably designed to identify individuals whose death would require the payment of benefits by the insurer under a life insurance policy, annuity contract, or retained asset account.

(3) For a group life insurance policy, an insurer is not required to perform the comparison required under paragraph (1) of this subsection unless the insurer provides full record-keeping services to the group life insurance policy holder.

Ins. § 16-118 (c)(1)-(3).

If the comparison reveals a match in the Social Security Administration's Death Master File, an insurer is required to 1) "conduct a good faith effort to confirm the death of the insured, annuitant, or retained asset account holder using other available records and information;" 2) "determine whether benefits are due under the applicable life insurance policy, annuity contract, or retained asset account;" and 3) "use good faith efforts to locate the beneficiary" and "provide to the beneficiary the appropriate claims forms and instructions necessary to make a claim[,]" "if benefits are due under the policy, contract, or retained asset account." Ins. § 16-118(d)(1)(i)-(iii)(1)-(2). The statute does not reflect whether insurers are required to perform the comparison for in-force policies prior to the statute's effective date.

Failure to comply with the requirements of Ins. § 16-118 constitutes an "unfair claim settlement practice[,]" Ins. § 27-303(10), punishable by civil penalties up to $2,500 per violation, Ins. § 27-305(a)(1) or restitutionary penalties, Ins. § 27-305(c)(1). For violations of Ins. § 27-304 (unfair claim settlement practices committed with frequency), the Commissioner is authorized to revoke or suspend an insurer's license, Ins. §§ 27-305(b);

- 4 -

4-113; issue cease and desist orders, Ins. §§ 27-103; 4-114; or impose misdemeanor penalties, Ins. § 1-301.

**Petitioners' challenge to Ins. § 16-118**

On February 28, 2013, Petitioners, through their representatives, attended a meeting with the then-Insurance Commissioner, Therese M. Goldsmith ("Commissioner Goldsmith"),[3] who indicated her view that Ins. § 16-118 applied to all in-force policies, including those in effect prior to the statute's effective date. Commissioner Goldsmith further advised that she would enforce the requirements of the statute against all of Petitioners' in-force policies. Thereafter, in July 2013, Petitioners filed a civil action against the MIA and Commissioner Goldsmith in the Circuit Court for Anne Arundel County, seeking a declaration that the statute was inapplicable to insurance policies issued prior to its effective date.

---

[3] Effective February 27, 2015, Al Redmer, Jr. replaced Therese Goldsmith as Maryland Insurance Commissioner.

Petitioners advanced the following grounds for relief: 1) the retroactive enforcement of the statute violated Articles 19[4] and 24[5] of the Maryland Declaration of Rights and Article III, § 40[6] of the Maryland Constitution; 2) the retroactive enforcement of the statute abrogated their substantive contract rights in violation of those same provisions; and 3) the retroactive enforcement of the statute constituted an unconstitutional impairment of their contractual rights in violation of Article I, § 10[7] of the United States Constitution.

------

[4]Article 19 provides:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land.

[5] Article 24 provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land (amended by Chapter 681, Acts of 1977, ratified Nov. 7, 1978).

[6] Article III § 40 provides:

The General Assembly shall enact no Law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation.

[7] Article I § 10 provides, in pertinent part:

No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.] . . .

Petitioners sought a judgment declaring that the statute did not apply retroactively to their in-force policies as of the effective date, or alternatively, that retroactive enforcement of the statute would be void because it violated one or more constitutional provisions. The MIA filed a motion to dismiss, alleging that the Insurance Article provided administrative remedies that Petitioners were required to exhaust before seeking relief in the circuit court. In granting MIA's motion, the court held that the administrative remedy outlined in Ins. § 2-210[8] must be exhausted before Petitioners pursued a declaratory judgment, given the strong presumption that the available remedy was primary, *i.e.,* a remedy in which a claimant must first invoke and exhaust before seeking a judicial remedy, and the absence of factors weighing against that presumption.

The court further held that Petitioners' claim did not fall within the exception to the administrative exhaustion requirement, since the claim was not solely a constitutional challenge to the General Assembly's authority to enact retroactive legislation, but was also a challenge to the MIA's interpretation and application of the law regarding retroactivity. Thereafter, Petitioners noted a timely appeal to the Court of Special Appeals.

---

[8] Ins. § 2-210 provides, in relevant part:

(a)(1) The Commissioner may hold hearings that the Commissioner considers necessary for any purpose under this article.

    (2) The Commissioner shall hold a hearing:
        (i) if required by any provision of this article; or
        (ii) except as otherwise provided in this article, on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner, except an order to hold a hearing or an order resulting from a hearing.

In considering the factors enunciated in *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 64-66, 706 A.2d 1060, 1069-70 (1998), which outlined the test for determining whether an administrative remedy is primary, the Court of Special Appeals held that Ins. § 2-210 provided a primary administrative remedy for the following reasons: the statute was comprehensive and encompassed challenges to the MIA's interpretation of Ins. § 16-118; Petitioner's challenge was dependent upon the Insurance Article's statutory scheme since it "pertain[ed] to how the [MIA] propose[d] to interpret and enforce the statutory scheme and how the [MIA's] interpretation affects their constitutional rights[;]" and assessing the nature and extent of the alleged impairment of Petitioners' contractual rights were matters within the purview of the agency's expertise.

The Court also accorded weight to the MIA's view that it maintained primary jurisdiction over Petitioners' challenge. Additionally, the Court observed that Petitioners' contention did not fall within the constitutional exception to the rule requiring exhaustion of administrative remedies, reasoning that "Petitioners assert[ed] a non-constitutional theory of relief, [in which] invocation of the constitutional exception [was] inappropriate." This Court subsequently granted certiorari.

**STANDARD OF REVIEW**

Whether a plaintiff must exhaust administrative remedies prior to bringing suit is a legal issue which the Court of Appeals reviews *de novo. See Falls Road Community Ass'n, Inc. v. Baltimore County*, 437 Md. 115, 134, 85 A.3d 185, 197-98 (2014); *see also Forster v. State, Office of Public Defender*, 426 Md. 565, 580, 45 A.3d 180, 189 (2012) ("In addition to Maryland Rule 8–131(a) indicating generally that we may consider issues

'raised in or decided by the trial court,' we may consider, *[sua sponte]*, whether available administrative remedies have been exhausted.") (emphasis omitted).

## DISCUSSION

**I.** **Petitioners are required to first pursue and exhaust available administrative remedies before seeking relief in the circuit court**

The doctrine of administrative exhaustion concerns "the relationship between legislatively created administrative remedies and alternative statutory, common law or equitable judicial remedies." *Prince George's County. v. Ray's Used Cars*, 398 Md. 632, 644, 922 A.2d 495, 502 (2007). In *Ray's Used Cars*, 398 Md. at 644-45, 922 A.2d at 502, we observed that "[w]henever the [General Assembly] provides an administrative and judicial review remedy to resolve a particular matter or matters, the relationship between that administrative remedy and a possible alternative judicial remedy will ordinarily fall into one of three categories[:]"

> [T]he administrative remedy may be *exclusive*, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.

> [T]he administrative remedy may be *primary* but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.

> [T]he administrative remedy and the alternative judicial remedy may be fully *concurrent*, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy.[9]

---

[9] In the case at bar, it is undisputed that Ins. § 2-210 does not provide an exclusive remedy. Accordingly, our analysis will address only whether the statute provides a primary or a concurrent administrative remedy.

(quoting *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 60-61, 706 A.2d 1060, 1067-68 (1998) (footnote omitted) (emphasis added); *see also Carter v. Huntington Title & Escrow, LLC*, 420 Md. 605, 616, 24 A.3d 722, 728-29 (2011) ("[W]e held that, where the [General Assembly] provides '[(1)] an administrative and judicial review remedy . . . and [(2)] a possible alternative judicial remedy' for a 'particular matter or matters,' we must determine whether it intended the agency to have exclusive, primary, or concurrent jurisdiction.") (citation omitted).

In the absence of specific statutory language indicating the type of administrative remedy, there is a rebuttable presumption that an administrative remedy was intended to be primary. *Zappone*, 349 Md. 63, 706 A.2d at 1070. Thus, "a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy." *Id*. (citations omitted). *See also Maryland Reclamation Associates, Inc. v. Harford County*, 342 Md. 476, 493, 677 A.2d 567, 576 (1996) ("[T]his Court has 'ordinarily construed the pertinent [legislative] enactments to require that the administrative remedy be first invoked and followed' before resort to the courts."); *Clinton v. Board of Education of Howard County*, 315 Md. 666, 678, 556 A.2d 273, 279 (1989) ("Ordinarily when there are two forums available, one judicial and the other administrative, . . . and no statutory directive indicating which should be pursued first, a party is often first required to run the administrative remedial course before seeking a judicial solution.").

The remedial provision at issue, Ins. § 2-210(a)-(b), provides the following:

**In general**

(a)(1) The Commissioner may hold hearings that the Commissioner considers necessary for any purpose under this article.

(2) The Commissioner shall hold a hearing:
(i) if required by any provision of this article; or
(ii) except as otherwise provided in this article, on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner, except an order to hold a hearing or an order resulting from a hearing.

**Demand for hearing**

(b)(1) A demand for a hearing shall state the grounds for the relief to be demanded at the hearing.

(2) Within 30 consecutive days after receiving a demand for a hearing, the Commissioner shall:
(i) grant and, unless postponed by mutual consent of the parties, hold the hearing; or
(ii) issue an order refusing the hearing.

(3) If the Commissioner does not grant or refuse a hearing within the 30-day period, the hearing is deemed to have been refused.

Petitioners aver that administrative exhaustion is not required, since Ins. § 2-210(a)(2) provides a concurrent, rather than a primary remedy, in which they have the option to pursue administrative relief or a declaratory judgment. We disagree. The Insurance Article does not expressly or impliedly indicate whether Ins. § 2-210 is a concurrent remedy, and Petitioners' argument fails to rebut the presumption that the available administrative remedy was not intended to be primary. We explain.

In determining whether the presumption that an administrative remedy is primary prevails, we consider the following four factors: 1) the comprehensiveness of the administrative remedy in addressing an aggrieved party's claim; 2) the administrative agency's view of its jurisdiction over the matter; 3) the claim's dependence upon the statutory scheme; and 4) the claim's dependence upon the administrative agency's expertise. *Zappone*, 349 Md. at 64-66, 706 A.2d at 1069-70 (hereinafter "the *Zappone* factors"). *See also Carter*, 420 Md. at 617, 24 A.3d at 729 ("[W]e weigh at least four germane factors, including: 'the comprehensiveness of the administrative remedy,' the 'agency's view of its own jurisdiction,' the claim's 'depeden[ce] upon the statutory scheme which also contains the administrative remedy,' and the claim's 'dependen[ce]' upon the agency's expertise.").

### a. Factor One: The Insurance Article provides a comprehensive remedial scheme

"A very comprehensive administrative remedial scheme is some indication that the [General Assembly] intended the administrative remedy to be primary, whereas a non-comprehensive administrative scheme suggests the contrary." *Zappone*, 349 Md. at 64, 706 A.2d at 1070 (citations omitted). In *Carter*, 420 Md. at 627, 24 A.3d at 735, we observed that "the General Assembly created a comprehensive, if not complex, regulatory and remedial scheme [in the Insurance Article]. . . ." (quoting *Zappone*, 349 Md. at 64, 706 A.2d at 1070). Therefore, the relevant inquiry is whether the statutory scheme is *sufficiently comprehensive*, in that it encompasses any claim raised by an aggrieved party, and "preclude[s] resort to a *fully* independent common law remedy. . . ." *Carter*, 420 Md.

- 12 -

at 627, 24 A.3d at 735 (quoting *Zappone*, 349 Md. at 67, 706 A.2d at 1071) (emphasis in original). *See, e.g.*, *Carter*, 420 Md. at 627-28, 24 A.3d at 735 ("The question, however, is whether [the Insurance Article's] scheme is sufficiently comprehensive, such that the [General Assembly] displayed an intent for claims . . . to proceed first through the MIA."). *See generally Equitable Life Assur. Soc. of U.S. v. State Comm'n on Human Relations*, 290 Md. 333, 337-39, 430 A.2d 60, 63-64 (1981) (rejecting an argument that the Unfair Trade Practices provision of the Insurance Article was entirely comprehensive to the extent that it precluded concurrent jurisdiction by the Commission of Human Relations in resolving an alleged unfair discriminatory practice in insurance sales).

Where a claim alleges and depends upon a "statutory benchmark violation," contemplated by the Insurance Article, the statutory remedy is deemed sufficiently comprehensive, and thus, the claim "should be considered first by the administering agency." *Carter*, 420 Md. at 628, 24 A.3d at 735. Notably, the fact that the Insurance Article may, under certain circumstances, "suggest that the administrative remedy is merely concurrent for truly and fully independent common law claims, . . ." does not negate the "primary jurisdictional grant for claims alleging what amounts to purely statutory violations." *Id*.

We, therefore, disagree with Petitioners' contention that Ins. § 2-210 fails to provide a comprehensive remedy, because it "does not encompass . . . [their] constitutional challenges to retroactive insurance legislation."[10] Section 2-210(a)(2)(ii) of the Insurance Article provides that the Commissioner "*shall hold a hearing . . .* on written demand by a person aggrieved by any act of, *threatened act of,* or failure to act by the Commissioner. . . ." (emphasis added). The Insurance Article does not specifically define "threatened act." However, a plain reading of the statutory language unambiguously reveals that the remedy encompasses Petitioners' constitutional challenges to retroactive legislation, since their claim was predicated upon Commissioner Goldsmith's statement that the MIA *would enforce* the requirements of Ins. § 16-118 against Petitioners' in-force policies.

In interpreting the meaning of "threatened act," we remain cognizant that "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the [General Assembly]." *Griffin v. Lindsey*, 444 Md. 278, 287, 119 A.3d 753, 758 (2015) (citation omitted). Thus, in discerning the General Assembly's intent, we consult the well-established canons of statutory construction:

> [W]e begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of

---

[10] Although we reject Petitioners' argument on other grounds, we re-emphasize that the MIA is deemed fully competent to address issues regarding the constitutionality of statutes or ordinances, whether as applied or on its face. *See Ray's Used Cars*, 398 Md. at 650-51, 922 A.2d at 506 ("[I]t should be emphasized that 'Maryland . . . administrative agencies are fully competent to resolve issues of constitutionality and the validity of statutes or ordinances in adjudicatory administrative proceedings which are subject to judicial review.'") (quoting *Montgomery County v. Broadcast Equities, Inc.*, 360 Md. 438, 451 n.8, 758 A.2d 995, 1002 n.8 (2000)).

- 14 -

construction. . . . We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone.  Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the [General Assembly] in enacting the statute.

*Id*. at 287, 119 A.3d at 758 (citation omitted).

A "threat" is defined, in part, as "*a declaration, express or implied, of an intent to inflict loss* or pain on another[.]" Black's Law Dictionary (10th ed. 2014) (emphasis added); Merriam-Webster's Collegiate Dictionary, Eleventh Edition (defining a threat, in part, as "an indication of something impending[.]").  In Petitioners' amended complaint, they alleged, in relevant part:

> [Petitioners] bring this action solely to challenge the retroactive application of [Ins. § 16-118].  The [MIA] has advised [Petitioners] that the [statute's] requirements must be applied to [Petitioners'] existing, in-force policies.  If applied to those policies, the [statute] would require [Petitioners] to assume substantial new obligations that were never contemplated or agreed to by [Petitioners], that are contrary to the long-standing allocation of rights and responsibilities under [Petitioners'] policies, and that undermine the actuarial and economic assumptions underlying those policies.
>
> *  *  *
>
> [Ins. § 16-118] imposes substantial new obligations on life insurers licensed to issue policies in the State, including in particular, the obligation to perform a [Social Security Death Master File] search for all in-force policies within six months of the [statute's] effective date, and to then confirm the insureds' deaths, determine whether benefits are payable, and locate beneficiaries.
>
> Failure to comply with any of the requirements of [Ins. § 16-118] constitutes an 'unfair claim settlement practice' under the Maryland Insurance Code Md. Ins. Code [§] 27-303(10).  The Code prescribes severe civil penalties for such practices, including civil fines of $2,500 per violation, *id*. [§] 27-305(a)(1), restitutionary penalties, *id*. § 27-305(c)(1), and revocation or suspension of an insurer's license, *id*. § 4-113. . . .

[Commissioner Goldsmith] and the Principal Counsel for the Office of the Attorney General advised [Petitioners] in a meeting held on February 28, 2013 at the offices of the [MIA] that [it] interprets [Ins. § 16-118] to apply to all in-force policies, including those issued prior to the [statute's] effective date. The [MIA] further indicated that it would enforce the requirements of the [statute] against all of [Petitioners'] in-force policies, including those issued prior to the [statute's] effective date. . . .

Consistent with the plain meaning of the term "threat," we conclude that Commissioner Goldsmith's statement constituted a "threatened act," within the meaning of Ins. § 2-210. As reflected in Petitioners' complaint, the Commissioner expressly declared that the MIA would enforce the requirements of Ins. § 16-118 to all of Petitioners' in-force policies, including those policies issued prior to the statute's effective date. If Petitioners failed to comply with the requirements, they would be in violation of the statute and subject to civil or criminal penalties (*i.e.*, losses) for engaging in "unfair claim settlement practices." *See* Ins. §§ 27-303(10); 27-305. Commissioner Goldsmith's statement constituted a threat to Petitioners because "enforc[ing] the requirements of [Ins. § 16-118] against all of [Petitioners'] in-force policies, including those issued prior to the [statute's] effective date, . . ." would impose economic losses, or alternatively, civil or criminal penalties for non-compliance. Thus, by virtue of the Commissioner's "threatened act," Petitioners are the "person[s] aggrieved[,]" who upon written demand, can pursue relief by requesting a hearing before the Commissioner. Ins. § 2-210(a)(2)(ii).

Accordingly, Petitioners' assertion that Commissioner Goldsmith's "informal" statement during a non-public meeting prior to the statute's effective date was not a threatened act within the meaning of Ins. § 2-210, is unavailing. As an initial matter, a "threat" contemplates impending action, *see supra*. Thus, the fact that the statement was

made prior to the statute's effective date is of no consequence. Moreover, the context and location of Commissioner Goldsmith's statement is not dispositive, because it does not negate the impending effect, which, in our view, was intended to further the statute's purpose, and encourage Petitioners' compliance.

Additionally, as the Court of Special Appeals observed, the fact that the Commissioner is authorized to review both "acts" and "threatened acts," *see* Ins. § 2-210(a)(2)(ii), under the statute is particularly significant, because it reveals the General Assembly's intent to encompass imminent action, such as Commissioner Goldsmith's declaration that Ins. § 16-118 would be enforced retroactively. *See United Insurance*, 2015 WL 5968833 at *12.

We are similarly not persuaded by Petitioners' alternative argument concerning the scope of the remedy provided under Ins. § 2-210. Petitioners aver that assuming Commissioner Goldsmith's statement constituted a threat, administrative exhaustion was not required because they were entitled to request a hearing under Ins. § 2-210 at their discretion, which provided the "option," and not an "obligation" to pursue administrative relief or a declaratory judgment (emphasis omitted).

While the statute does not reflect that an aggrieved party *must* request a hearing, this does not mean that Ins. § 2-210 is a concurrent remedy. Petitioners' focus on their right to "make[] the election" ignores long-standing Maryland precedent, which expressly provides that an administrative remedy is intended to be primary, unless the presumption is rebutted, or an aggrieved party's claim is exempt from administrative exhaustion. *See Zappone*, 349 Md. at 63, 706 A.2d at 1070; *Prince George's County v. Blumberg*, 288 Md. 275, 284-85,

418 A.2d 1155, 1161 (1980) (outlining the five exceptions to the administrative exhaustion requirement).

### b. Factor Two: The MIA's view of its primary jurisdiction over Petitioners' claim is instructive

Relevant to this factor is determining whether "the General Assembly has provided a special form of remedy and established a statutory procedure before an administrative agency for a special kind of case[.]" *Carter*, 420 Md. at 629, 24 A.3d at 736 (quoting *Muhl v. Magan*, 313 Md. 462, 480-81, 545 A.2d 1321, 1330 (1988)). A "special form of remedy" is generally an indication that "a litigant must ordinarily pursue that form of remedy and not by[-]pass the administrative official. . . ." *Carter*, 420 Md. at 629, 24 A.3d at 736 (quoting *Muhl*, 313 Md. at 480-81, 545 A.2d at 1330); *Zappone*, 349 Md. at 65, 706 A.3d at 1070.

The MIA views its jurisdiction over Petitioners' claim as primary. In light of our conclusions *infra*, that Petitioners' claim depends upon the statutory scheme of the Insurance Article and the expertise of the MIA, we are persuaded that the MIA maintains primary jurisdiction over Petitioners' claim. *See Carter*, 420 Md. at 629, 24 A.3d at 736 (noting that consideration of the remaining *Zappone* factors would support the Court's conclusion that the allegations in Carter's complaint were not "truly and fully independent common law claims," in which the General Assembly has provided him "a special form of remedy[]"); *Zappone*, 349 Md. at 65, 706 A.3d at 1070 (acknowledging "that an agency's interpretation of the statute which it administers" and its "interpretation that the remedy

- 18 -

before the agency was not intended to be primary[,]" is entitled to weight) (citation omitted).

### c. Factor Three: Petitioners' claim depends upon the statutory scheme of the Insurance Article

Whether a plaintiff's claim is dependent on the statutory scheme is accorded significant weight in determining the nature of an administrative remedy. *See Zappone*, 349 Md. at 65, 706 A.2d at 1070 ("An extremely significant consideration . . . is the nature of the alternative judicial cause of action pursued by [a] plaintiff."). Thus, "[w]here the judicial cause of action is wholly or partially dependent upon the statutory scheme . . . the Court has usually held that the administrative remedy was intended to be primary and must first be invoked and exhausted before resort to the courts." *Id*.

Petitioners aver that their claim is not dependent on the statutory scheme, since their "claim is constitutional, not statutory, and therefore is 'entirely independent' from the Insurance Article." We disagree, and are persuaded by the MIA's argument that "[Petitioners'] claim is wholly dependent on the Insurance Article because, without the enactment of [Ins.] § 16-118(c)(1) and [Commissioner Goldsmith's] threatened enforcement action . . . [Petitioners] would have no claim."

Petitioners cite to *Zappone*, 349 Md. at 64-66, 706 A.2d at 1069-70 and *Mardirossian v. Paul Revere Life Ins. Co*., 376 Md. 640, 642, 649, 831 A.2d 60, 61, 65-66 (2003), and asserts that "[t]his Court has twice held that parties are not required to exhaust 'common law' claims in administrative hearings before the [Insurance] Commissioner." Petitioners' reliance on these cases is misplaced. In *Zappone*, 349 Md. 45, 50, 706 A.2d

- 19 -

1060, 1062, this Court considered whether "the provisions of the Insurance [Article] pertaining to unfair trade practices by insurers and their agents provide[d] [an] exclusive or primary remedy [to consumers] for alleged acts of fraud, negligent misrepresentation, and negligence by an insurer or agent in connection with the sale of insurance."

In the original complaint, Zappone, shareholder of a printing shop, filed suit against his insurance provider, Liberty Life Insurance Company, alleging fraud, negligent misrepresentation, and negligence. *Id*. at 52, 56, 706 A.2d at 1064-65. Observing that the Insurance Article did not provide an exclusive or primary remedy to redress Zappone's "recognized common law causes of action sounding in deceit and negligence[,]" we held that the claim was "wholly independent of the [Insurance Article's] Unfair Trade Practices subtitle." *Id*. at 65-68, 706 A.2d at 1071. We reasoned:

> No interpretations or applications of the Insurance Code or of any regulations by the Insurance Commissioner are involved. Instead, under the plaintiff's allegations and theory of the case, their right to recover money damages is totally dependent upon the common law tort principles applicable to deceit and negligence actions. . . .

*Id*. at 67.

Similarly in *Mardirossian*, 376 Md. at 642, 831 A.2d at 61, this Court considered whether "Maryland law provide[d] a judicial cause of action, entirely independent of the Maryland Insurance [Article], for a claim to compel specific performance on an oral contract for disability insurance[.]" We observed that "the General Assembly did not intend that the Insurance Commissioner's authority, to restrain unfair practices, [under the Unfair and Deceptive Trade Practices subtitle of the Insurance Article], modified Maryland common law contract enforceability principles." *Id*. at 649, 831 A.2d at 65. Accordingly,

- 20 -

we held that "[t]he Maryland common law contract remedy [was] fully concurrent [with the administrative remedy under the Insurance Article], and may be pursued in court without exhausting the administrative remedy. . . ." *Id.*

*Zappone* and *Mardirossian* are distinguishable from the case at bar, since the claims advanced in those cases "were treated as common law in nature because they existed without an essential underpinning found in the Insurance Article." *Carter*, 420 Md. at 630, 24 A.3d at 736. Here, Petitioners' claim is dependent upon the statutory scheme because it is predicated on how the MIA interprets and will enforce Ins. § 16-118. In Petitioners' complaint, they alleged, "[Petitioners] bring this action solely to challenge the retroactive application of the [Ins. § 16-118]" because "[t]he [MIA] . . . advised [Petitioners] that the [statute's] requirements must be applied to [Petitioners] existing, in-force policies." Similarly, in support of Petitioners' contention that Commissioner Goldsmith's statement did not constitute a "threatened act" under Ins. § 2-210, they alleged:

> [Commissioner Goldsmith] simply disclosed her view that [Ins. § 16-118] is retroactive. . . . It was a statement of belief about what the General Assembly required the Commissioner to do when it enacted the law. Nothing in the statutory text indicates that the General Assembly intended to require litigants to exhaust administrative remedies when the Commissioner, in an informal, non-public meeting, shares an opinion that a particular law is retroactive.

As the Court of Special Appeals concluded, although Petitioners' claim "may lie in constitutional law, the entirety of their claims pertain to how the Commissioner propose[d] to interpret and enforce the statutory scheme and how the Commissioner's interpretation [of the statute] affect[ed] their constitutional rights." *United Insurance*, 2015 WL 5968833 at *6. Petitioners' contentions are predicated upon a particularized construction of the

- 21 -

relevant statutory provisions, reflected in their complaint. Petitioners sought a declaration that Ins. § 16-118 was "consistent with Maryland's presumption against retroactive operation of new laws, [and] only applie[d] prospectively to life insurance policies issued on or after the [statute's] effective date, and does not apply to policies already in-force as of that date."

Petitioners also advanced an alternative claim, asserting that "if [Ins. § 16-118] were to be construed to have retroactive effect," they sought a declaration that the statute "substantially impairs their contractual rights under their in-force policies[,]" in violation of "Articles 19, 24, and 25[11] of the Maryland Declaration of Rights, Article III, § 40 of the Maryland Constitution, and the Contract Clause of the [U.S.] Constitution." Moreover, Petitioners' contention that Ins. § 16-118 "would require [Petitioners] to assume substantial new obligations . . ." and that a "[f]ailure to comply with any of the requirements of the [statute] . . ." would expose them to "severe civil penalties" for engaging in unfair settlement practices, emphasized *the MIA's interpretation* of the statute, and the consequences that would result from noncompliance.

Since the record reflects that Petitioners' claim is dependent upon the statutory scheme, Petitioners cannot simply by-pass the administrative exhaustion requirement and "pursue directly a judicial remedy in a court of law . . . by characterizing or recasting" their action as a common law claim. *Carter*, 420 Md. at 627-28, 24 A.3d at 735; *see also id*. at

---

[11] Article 25 provides:

That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law.

- 22 -

630-33, 24 A.3d at 736-38 (holding that Carter's claim regarding a rate charged "in excess of the MIA-approved schedule[]" was dependent on the statutory scheme, "irrespective of whether that schedule became part of some unspecified oral or written contract[]"); *cf. Zappone*, 349 Md. at 65-66, 706 A.2d at 1070 (observing that "where the alternative judicial remedy is entirely independent of the statutory scheme containing the administrative remedy . . . the Court has held that the . . . remedy was not intended to be primary and . . . the plaintiff could maintain the independent judicial cause of action without first invoking and exhausting the administrative procedures[]") (citations and footnote omitted).

### d. Fourth Factor: Petitioners' claim depends upon the expertise of the MIA

Similarly, "[w]here [the] judicial cause of action is wholly or partially dependent upon . . . the expertise of the administrative agency, the Court has [also] held that the remedy was intended to be primary and must first be invoked and exhausted before resort to the courts." *Zappone*, 349 Md. at 65, 706 A.2d at 1070. Petitioners aver that "the MIA's expertise in insurance regulation is not relevant to the questions [regarding] whether retroactive legislation is constitutional or whether the constitutional question can be avoided through the presumption against retroactivity." Specifically, Petitioners allege that "the question whether a statute operates retrospectively," does not involve "any special expertise of the [MIA]" and that "Maryland courts do not defer to the agency's determination on a question of constitutional law." (citations omitted). Although we acknowledge that the presumption against retroactivity has not been rebutted in the case at bar, for the reasons explained below, we nonetheless hold that Petitioners' claim depends

- 23 -

upon the expertise of the MIA, and therefore, it is appropriate to accord deference to the MIA's determinations.

### i. The presumption against retroactivity has not been rebutted

"Retrospective statutes are those 'acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act.'" *Muskin v. State Dep't of Assessments & Taxation*, 422 Md. 544, 557, 30 A.3d 962, 969 (2011) (quoting *Langston v. Riffe*, 359 Md. 396, 406, 754 A.2d 389, 394 (2000)).  In Maryland, statutes that operate retroactively are generally disfavored, and therefore, a statute is presumed to apply prospectively unless there is a "clear legislative intent to the contrary[.]" *Langston*, 359 Md. at 406, 754 A.2d at 394 (quoting *Traore v. State*, 290 Md. 585, 593, 431 A.2d 96, 100 (1981)).  This presumption "is particularly applicable where the statute adversely affects substantive rights. . . ." *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 146-47, 957 A.2d 595, 599 (2008).

In *John Deere*, 406 Md. at 147, 957 A.2d at 599, we observed that "although we have clearly established the analysis to be used when applying a statute retroactively, this Court has only provided limited analysis of *what* constitutes a retrospective application of a statute." (emphasis added).  In expressly adopting the U.S. Supreme Court's retroactivity analysis articulated in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483 (1994), we held that a statute applied retroactively where it "would impair rights a party possessed when he acted, increase[d] a party's liability for past conduct, or impose[d] new duties with respect to transactions already completed." *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. at 147, 957 A.2d at 599 (quoting *Landgraf*, 511 U.S. at

- 24 -

280, 114 S.Ct. at 1505); *see also Muskin*, 422 Md. at 557-58, 30 A.3d at 969 ("[R]etrospective statutes are those that 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'").

We rejected a "bright line rule" that a statute operated "'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment. . . ." *John Deere*, 406 Md. at 147, 957 A.2d at 600 (quoting *Landgraf*, 511 U.S. at 269, 114 S.Ct. at 1499). We, instead, held that the retroactivity determination "required a 'process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event[,]'" which considered factors of "fair notice, reasonable reliance, and settled expectations." *John Deere*, 406 Md. at 147, 957 A.2d at 600 (quoting *Landgraf*, 511 U.S. at 270, 114 S.Ct. at 1499) (hereinafter "the *Landgraf* factors").

"Fair notice" is satisfied where a reasonable time period exists between the enactment of new legislation and the deadline for compliance. *Muskin*, 422 Md. at 558, 30 A.3d at 970. In the case at bar, the record reveals that Petitioners did not receive the benefit of fair notice regarding the MIA's intent to retroactively enforce the requirements of Ins. § 16-118 to their in-force policies. Maryland Senate Bill 77 (2012) was passed by the General Assembly on April 2, 2012, signed into law as § 16-118 of the Insurance Article on May 2, 2012, and became effective on October 1, 2013. On February 28, 2013, approximately seven months prior to the statute's effective date, Petitioners were advised

of the MIA's plans for retroactive enforcement during a meeting with Commissioner Goldsmith and the Principal Counsel for the Office of the Attorney General.

Since the statute did not expressly or impliedly indicate whether it applied retroactively to Petitioners' in-force policies, they were not on notice of the enforcement until approximately seven months before compliance was required. *See, e.g.*, *State v. Goldberg*, 437 Md. 191, 206, 85 A.3d 231, 240 (2014) (holding that "fair notice [was] not satisfied by the provisions of Chapter 286[12] . . . [because] Chapter 286 was passed on [April 2, 2007], and made effective three months later on [July 1, 2007]"); *cf. Muskin*, 422 Md. at 558, 30 A.3d at 970 (holding that "fair notice [was] satisfied by the reasonable time period between enactment of Chapter 290[13] [on October 1, 2007] and the registration deadline of [September 30, 2010]."

Similarly, reasonable reliance and settled expectations are satisfied where the enactment of legislation does not severely impact future interests or vested rights of interested parties. *See, e.g.*, *Goldberg*, 437 Md. at 206, 85 A.3d at 240 ("Chapter 286 impacts severely the reasonable reliance and settled expectations of ground rent owners by virtue of its extinguishment of the right of reentry and destruction of the reversionary interest."); *Muskin*, 422 Md. at 558, 30 A.3d at 970 ("Chapter 290 impacts impermissibly

---

[12] Md. Code (1974, 2010 Repl. Vol.) § 8–402.2 of the Real Property Article (concerning ejectment procedures for defaulting lessees who were more than six months overdue on rent for ground leases) (subsequently preempted by *Goldberg*, 437 Md. 191, 206, 85 A.3d 231, 240 (2014)).

[13] Md. Code (1974, 2010 Repl. Vol.) § 8–703(a) of Real Property Article ("Ground Rent Registry Statute") (creating a process for the extinguishment and transfer of reversionary interests from the ground lease holder to the ground rent tenant).

the reasonable reliance and settled expectations of ground rent owners by virtue of its extinguishment and transfer features as the consequences for non-registration (or untimely registration) of ground rents.").

The contentions raised in Petitioners' complaint reveals that retroactive enforcement of Ins. § 16-118 may impact the reasonable reliance and settled expectations of Petitioners' existing business model and insurance policy framework. Petitioners alleged:

Applying the [statute's] requirements retroactively to the thousands of life insurance policies already in force on its effective date fundamentally restructures the terms of [Petitioners'] policies and the parties' long-settled understanding of their respective rights and obligations. [Petitioners'] existing life insurance policies were not priced to account for these new obligations or the assumption of these new costs and claim settlement procedures. Instead, the premium rates on [Petitioners'] in-force policies reflect their contractual expectations that a person seeking to claim benefits must furnish [Petitioners] with a claim and due proof of death and that, consequently, [Petitioners] do not have an obligation to proactively determine whether an insured is deceased or to incur administrative costs to search for proof of an insured's death or locate potential beneficiaries. The premiums also reflect the contractual expectation that [Petitioners] will retain and invest cash flows from the policies until either a claim is submitted or the insured reaches the mortality limiting age (typically, 99 years old). If the insured attains the mortality limiting age without a death claim being filed, the policy is deemed 'matured' and [Petitioners] are then obligated to pay the policy proceeds to the policy owner.

[Petitioners] set premium rates when a policy is issued and are prohibited from adjusting premium rates on in-force policies to account for these new obligations and costs. As a consequence, retroactively applying [Ins. § 16-118] to in-force policies deprives [Petitioners] of essential contractual rights and forces them to assume duties and costs that were never part of the contractual relationship with their policy owners. Retroactive application of the [statute's] requirements would alter the economics of [Petitioners'] contractual relationships, increasing the costs of the overall administration of their insurance business and depriving [Petitioners] of related investment income that is critical to the financial health of the business and that facilitates the orderly payment of claims to all policyholders. . . .

However, given the narrow procedural issue before this Court, specifically, whether Petitioners must first exhaust administrative remedies before pursuing a declaratory judgment, and in light of our conclusion *infra*, that Petitioners' claim is within the MIA's expertise, we shall not engage in an assessment regarding the reasonable reliance and settled expectations of future interests or vested rights.

### ii. Petitioners' claim implicates the MIA's expertise, despite the presumption against retroactivity

We, nonetheless, hold that determining the *accuracy* of Petitioners' assertions regarding the nature and extent of retroactive enforcement to their in-force policies, including the impact of enforcement on matters concerning reasonable reliance and settled expectations, depends upon the MIA's expertise. The expertise of the administering agency is a significant factor supporting administrative exhaustion. In *Ray's Used Cars*, 398 Md. at 650, 922 A.2d at 505, we explained:

> The reasons for requiring the exhaustion of administrative remedies before resorting to the courts are that it is within the expertise of the administrative agency involved to hear and consider the evidence brought before it and make findings as to the propriety of the action requested; courts would be performing the function that the [General Assembly] specified be done by the administrative agency; courts might be called on to decide issues that would never arise if the prescribed administrative remedies were followed; and where a statute provides a specific form of remedy in a specific case then this remedy must be followed. . . .

(quoting *Gingell v. Board. of County Comm'rs for Prince George's County*, 249 Md. 374, 376-77, 239 A.2d 903, 904, 905 (1968)) (citation omitted).

Petitioners allege that retroactive enforcement: 1) "[a]lters [t]he [p]arties' [e]xisting [c]ontractual [a]llocation of [r]ights [a]nd [r]esponsibilities [a]nd [w]ill [r]esult in

- 28 -

[s]ubstantially [i]ncreased [a]dministrative [c]osts[;]" 2) that "the costs of undertaking these new burdens [through compliance] . . . are substantial[]" in relation to the total amount of annual premiums collected and "the relatively modest face values of the policies at issue[;]" and 3) that compliance "[f]undamentally [a]lters the [e]conomic [a]ssumptions [u]nderlying [their] [p]olicies and the [p]remium [p]ricing."

As the administering agency of the Maryland insurance market, the MIA is responsible for, *inter alia*, "[p]rotect[ing] Maryland consumers by regulating the [S]tate's insurance companies and producers[;] "[c]onduct[ing] financial examinations of insurance companies to ensure solvency[;]" "[c]onduct[ing] market conduct examinations to ensure compliance with Maryland's insurance laws[;]" and "[r]eview[ing] and approv[ing] rates and contract forms." *See About the Maryland Insurance Administration*, MARYLAND.GOV, http://insurance.maryland.gov/About/Pages/default.aspx (last visited June 27, 2016).

Petitioners' claim implicates the MIA's expertise because it is premised upon the contractual expectations of insurers and policyholders, the processes they utilize in administering insurance policies, the consequences of producing compliant policies, and the factors assessed in setting prices and valuing policies. We, therefore, agree with the Court of Special Appeals that "determining whether [Petitioners' assertions] are factually accurate and assessing 'the nature and extent of the change in the law' in light of the existing regulatory framework are matters that lie fairly within the [MIA's] expertise." *United Insurance*, 2015 WL 5968833 at *16. *See, e.g.*, *Carter*, 420 Md. at 633-35, 24 A.3d at 738-39 (acknowledging that the MIA's expertise played a role "in deciding whether '[a] person [or insurer] . . . willfully collect[ed] a premium or charge for insurance'" in violation

of a statutory provision under the Insurance Article) (emphasis omitted); *see also id.* at 634, n.13, 24 A.3d at 739, n.13 (observing that by rendering findings of fact, "the Commissioner could serve a valuable prefatory fact-finding and analytical purpose sounding in judicial economy[]"); *Zappone*, 349 Md. at 65-66, 706 A.2d at 1070 (noting that "where the . . . expertise of the administrative agency *is not* particularly relevant to the judicial cause of action, the Court has held that the . . . remedy was not intended to be primary and . . . the plaintiff could maintain the independent judicial cause of action without first invoking and exhausting the administrative procedures[]") (citations and footnote omitted) (emphasis added).

Moreover, we accord great deference to the factual findings and legal conclusions of an administrative agency that are "premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose." *Frey v. Comptroller of Treasury*, 422 Md. 111, 138, 29 A.3d 475, 490 (2011) (citations omitted). In contrast, "[w]hen an agency's decision is necessarily premised upon the 'application and analysis of caselaw,' that decision rests upon 'a purely legal issue uniquely within the ken of a reviewing court.'" *Id.* (citation omitted). *See, e.g., Maryland State Comptroller of Treasury v. Wynne*, 431 Md. 147, 161, 64 A.3d 453, 461 (2013) ("Because our review of its analysis turns on a question of constitutional law, we do not defer to the agency's determination."). Accordingly, deference to the MIA's factual findings and legal conclusions, if any, is appropriate, because Petitioners' claim is not "a purely legal issue" concerning constitutional law, but is instead premised upon the MIA's interpretation and enforcement of Ins. § 16-118.

Additionally, in light of the foregoing, we also reject Petitioners' contention that they can alternatively pursue a declaratory judgment under § 3-409 of the Courts & Judicial Proceedings Article to challenge the constitutionality of Ins. § 16-118.[14]

## II. Petitioners' claim does not fall within the constitutional exception to the administrative exhaustion requirement

This Court recognizes the following five exceptions to the administrative exhaustion requirement:

1. When the legislative body has indicated an intention that exhaustion of administrative remedies was not a precondition to the institution of normal judicial action. *White v. Prince George's [County]*, 282 Md. 641, 649 387 A.2d 260, 265 (1978).

2. When there is a direct attack, constitutional or otherwise, upon the power or authority (including whether it was validly enacted) of the legislative body to pass the legislation from which relief is sought, as contrasted with a constitutional or other type issue that goes to the application of a general statute to a particular situation. *Harbor Island Marina v. Calvert [County]*, 286 Md. 303, 308, 407 A.2d 738, 741 (1979).

3. When an agency requires a party to follow, in a manner and to a degree that is significant, an unauthorized procedure. *Stark v. Board of Registration*, 179 Md. 276, 284–85, 19 A.2d 716, 720 (1941).

4. Where the administrative agency cannot provide to any substantial degree a remedy. *Poe v. Baltimore City*, 241 Md. 303, 308–09, 216 A.2d 707, 709 (1966).

5. When the object of, as well as the issues presented by, a judicial proceeding only tangentially or incidentally concern matters which the administrative agency was legislatively created to solve, and do not, in any meaningful way, call for or involve applications of its expertise. *[Maryland]-Nat'l [Capital]*

---

[14] *See* Md. Code (2006, 2013 Repl. Vol.) § 3-409 (c) of the Courts & Judicial Proceeding Article ("A party may obtain a declaratory judgment or decree notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy, whether or not recognized or regulated by statute.").

*[Park] & [Planning] v. [Washington] Nat'l Arena*, 282 Md. 588, 594–604, 386 A.2d 1216, 1222-27 (1978).

*Blumberg*, 288 Md. at 284-85, 418 A.2d at 1161

Petitioners rely on the second exception, known as the constitutional exception, and assert that even if the administrative remedy is primary, the administrative exhaustion doctrine should not apply in the case at bar because they advance "a direct attack" upon the General Assembly's power and authority to pass legislation that retroactively impairs their vested contract rights in violation of the Maryland and Federal Constitutions. Specifically, Petitioners contend that "[r]esolving [their] challenge requires a court to answer a single, fundamental question of constitutional law: does the General Assembly have the authority to enact a law that retroactively modifies the terms of pre-existing life insurance contracts?" We are not persuaded, and hold that the constitutional exception is inapplicable to the case at bar, because Petitioners do not challenge the overall constitutionality of the Ins. § 16-118, but instead, challenge the constitutionality of retroactive enforcement under the statute, as applied to their in-force policies.

The constitutional exception to the administrative exhaustion requirement is narrowly construed. *See Ray's Used Cars*, 398 Md. at 650, 922 A.2d at 506 ("Under Maryland administrative law, the 'constitutional exception' to the requirement that primary administrative remedies must be pursued and exhausted is an extremely narrow one."); *Montgomery County. v. Broad. Equities, Inc.*, 360 Md. 438, 455, 758 A.2d 995, 1004 (2000) ("[T]his Court has emphasized that the so-called 'constitutional exception' to the

normal rule that primary administrative and judicial review remedies must be followed is very 'narrow.'") (footnote omitted).

In *Ray's Used Cars*, 398 Md. at 652, 922 A.2d at 507, this Court held that a facial attack concerning the validity of a statute falls within the scope of the constitutional exception only when "'the attack [is] made to the constitutionality of the statute as a whole,' including all of its parts and all of its applications." (quoting *Goldstein v. Time-Out Family Amusement*, 301 Md. 583, 590, 483 A.2d 1276, 1280 (1984)).  Thus, when challenging the statute as a whole, an aggrieved party may proceed immediately to the court to seek a declaratory judgment or equitable remedy, regardless of the availability of an administrative remedy, because the "*sole contention raised* in the court action is based on a facial attack on the constitutionality of the governmental action." *Ehrlich v. Perez*, 394 Md. 691, 700, n.6, 908 A.2d 1220, 1225, n.6 (2006) (emphasis added) (citation omitted).

This Court's opinion in *Goldstein*, 301 Md. 583, 483 A.2d 1276, is instructive.  In that case, the Respondent, owner of Time-Out Family Amusement Centers, Inc. ("Time-Out"), filed a declaratory judgment action against the Comptroller of Maryland, seeking to have a tax exemption statute and the Comptroller's implementation regulations declared unconstitutional. *Id*. at 585-86, 483 A.2d at 1278.  Time-Out alleged that the statute and the implementation regulations were in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and the Maryland Declaration of Rights. *Id*.  The Comptroller sought to dismiss the complaint, asserting that Time-Out failed to exhaust all statutory administrative remedies, which the circuit court overruled.  The court also dismissed the Comptroller's subsequent summary judgment motion, and following a

merits hearing, rendered a written declaration in Time-Out's favor. *Id*. at 586-87, 483 A.2d at 1278.

In addressing whether Time-Out's claim qualified under the constitutional exception to administrative exhaustion on appeal, this Court opined:

> [W]e here explain that the 'constitutional exception' to which we have just alluded permits a judicial determination without administrative exhaustion when there is a direct attack upon the power or authority (including whether it was validly enacted) of the legislative body to adopt the legislation from which relief is sought.

> Thus it is apparent that to come within the 'constitutional attack' exception to the general rule concerning the exhaustion of administrative remedies, the attack must be made to the constitutionality of the statute as a whole *and not merely as to how the statute has been applied*. In our view the constitutional attack here was not to the statute as a whole.

*Id*. at 301 Md. at 590, 483 A.2d at 1280 (quotations and citation omitted) (emphasis added).

Aligned with those principles, we held that Time-Out was required to "exhaust its administrative remedies[,]" because Time-Out "was not attacking the General Assembly's legislative power to enact exemptions to a general taxation scheme[,]" but rather, "merely attacked certain exemptions granted to businesses similar to its own." *Id*. We observed that "[a]lthough Time-Out originally claimed to attack the exemption statute in its entirety, it [was] clear . . . that its real protest focused upon the statutory exemptions granted to recreational businesses,[] and not upon the exemptions for non-profit and charity exemptions which [were] also contained in [the tax exemption statute]." *Id*.

We similarly rejected Time-Out's equal protection challenges. *Id*. at 591, 483 A.2d at 1281. Time-Out alleged that "the Comptroller's decision to allow some businesses to use [a] 'tax included' option while denying Time-Out that economic advantage[]" violated

their equal protection rights. *Id.* Specifically, they asserted "that the Comptroller construed the regulation 'to allow one class of persons to pass on the tax while prohibiting another class of persons from passing on the tax. . . .'" *Id.* We opined that by "disagree[ing] with the Comptroller's interpretation of the regulation[,]" Time-Out attacked "the application of the regulation itself[.]" *Id.* Thus, we held that Time-Out's challenge reflected an attack "upon the application of a regulation to a particular situation," in which Time-Out was required to exhaust administrative remedies. *Id.* (citing *State Dep't of Assessments & Taxation v. Clark*, 281 Md. 385, 404, 380 A.2d 28, 39 (1977)).

Petitioners contend that they are "challeng[ing] the statute as written and as a whole[,]" because "if they prevail, the effect will be to categorically block [Ins. § 16-118] from applying to insurance contracts that were issued prior to its effective date." This is a strained reading of Ins. § 16-118. Consistent with *Goldstein*, 301 Md. at 590, 483 A.2d at 128, Petitioners' claim does not fit within the constitutional exception, because they do not attack the constitutionality of Ins. § 16-118 as a whole, but only retroactive enforcement, as applied only to their in-force policies. Specifically, Petitioners do not seek to have the entire statute declared unconstitutional,[15] but instead, pursue only a declaratory judgment that the statute does not apply retroactively, or, in the alternative, that it is void if applied to in-force policies in effect prior to its enactment.

_____

[15] Notably, Petitioners do not challenge the General Assembly's authority to enact Ins. § 16-118, and, in fact, conceded that the statute can be applied prospectively to life insurance policies:

(continued . . .)

Additionally, as observed in *Goldstein*, the fact that Petitioners interpretation of Ins. § 16-118 — that the statute should not be applied retroactively to their in-force policies — is in disagreement with the MIA's interpretation indicating to the contrary, is particularly relevant. *See id.* 301 Md. at 591, 483 A.2d at 1281. Thus, although Petitioners allege that they are challenging the constitutionality of the statute in its entirety, Petitioners' "real protest" *focuses only upon the constitutionality of a part of the statute* (*i.e.*, the retroactive enforcement of Ins. § 16-118), and more importantly, *how the statute is applied to a particular situation* (*i.e.*, against Petitioners' in-force policies). *See id.* at 590-91, 483 A.2d at 1280-81. Accordingly, Petitioners do not qualify for the constitutional exception, as an alternative to their primary argument concerning the construction of the statute, because their reliance on the exception is premised upon more than one claim that is not solely constitutional. *See Ehrlich*, 394 Md. at 700, n.6, 908 A.2d at 1225, n.6, *supra* (holding that a party who challenges a statute as a whole is not required to exhaust administrative remedies when the "*sole contention raised* in the court action is based on a facial attack on the constitutionality of the governmental action[]") (emphasis added) (citation omitted). *See also Goldstein*, 301 Md. 590-91, 483 A.2d at 1280-81; *Ray's Used Cars*, 398 Md. at

---

( . . . continued)

> [Petitioners] do not dispute that Maryland has the authority to require this change with respect to new life insurance policies issued on or after the effective date of [Ins. § 16-118]. [Petitioners] have been doing business in the State for decades and recognize the General Assembly's power and responsibility to regulate the business of insurance consistent with the Constitution and laws of Maryland.

654-55, 922 A.2d at 508 (rejecting the plaintiffs' claim that the constitutional exception applied because they did not attack the statute "as a whole"); *Ins. Com'r of State of Md. v. Equitable Life Assur. Soc. of U.S.*, 339 Md. 596, 619, 664 A.2d 862, 874 (1995) ("[W]here a party is not challenging the validity of a statute as a whole," but instead "that the statute as applied in a particular situation is unconstitutional, . . . [the Court of Appeals] has regularly held that the constitutional issue must be raised and decided in the statutorily prescribed administrative and judicial review proceedings.").

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**