*David Boyd, et ux. v. The Goodman-Gable-Gould Company*, No. 2139, September Term 2019. Opinion by Eyler, James R., J.

## Administrative Law-Collateral Estoppel

**Facts**: In 2016, a fire destroyed the home of David Boyd and Penny Coco-Boyd (collectively "the Boyds"), appellants. They gave notice of their loss to State Farm Fire and Casualty Company ("State Farm"), their homeowners' insurer. They later engaged a public adjuster, The Goodman-Gable-Gould Co., d/b/a Goodman-Gable-Gould Co./Adjusters International ("GGG"), appellee, to adjust their claim with State Farm in exchange for a fee of six percent of any proceeds collected on their behalf.

Unsatisfied with GGG's services, the Boyds filed a complaint with the Maryland Insurance Administration ("MIA"), alleging that GGG, through its agents, engaged in fraudulent and dishonest practices, displayed incompetence, and wrongfully withheld monies from them. The Boyds sought over $100,000 in restitution and the return of insurance proceeds they alleged were being withheld by GGG. They also asked the MIA to impose administrative penalties on GGG.

While that complaint remained pending, the Boyds filed in the Circuit Court for Montgomery County against GGG a complaint for declaratory judgment, the instant action, seeking a declaration that they had a legal right to terminate their contract with GGG. After the MIA completed its investigation of the administrative complaint and issued a preliminary decision in GGG's favor, the Boyds did not request an administrative hearing to contest that determination. They filed an amended complaint in the circuit court action adding claims for breach of contract, restitution, negligence, and fraud, and seeking compensatory and punitive damages.

GGG moved for summary judgment on the ground that the Boyds were collaterally estopped by the MIA decision from pursuing any relief and moved to strike the amended complaint. Following a hearing, the circuit court granted GGG's motions for summary judgment and to strike, concluding respectively that the Boyds were collaterally estopped by the MIA decision and that GGG suffered actual prejudice occasioned by the timing of the amendments to the complaint. The Boyds' motions for reconsideration and to alter or amend were denied.

The issues on appeal were whether the court erred in granting summary judgment and erred in striking the amended complaint.

**Held**: The MIA action initiated by the Boyds was a complaint, not an "examination" within the meaning of the Insurance Article and implementing regulations, but the MIA decision was not a quasi-judicial proceeding, and thus, the Boyds were not collaterally estopped by the decision. Moreover, the Boyds were not required to exhaust

administrative remedies before pursuing relief in the circuit court because the relevant factors weighed in favor of concurrent jurisdiction.

Thus, the circuit court erred in granting summary judgment. Because the circuit court struck the amended complaint on the ground of collateral estoppel, the court also erred in that ruling.

Circuit Court for Montgomery County
Case No. 444997V

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2139

September Term, 2019

_____

DAVID BOYD, ET UX.

v.

THE GOODMAN-GABLE-GOULD
COMPANY D/B/A GOODMAN-GABLE-
GOULD/ADJUSTERS INTERNATIONAL

_____

Fader, C.J.
Beachley,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.

_____

Filed: May 27, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In 2016, a fire destroyed the home of David Boyd and Penny Coco-Boyd (collectively "the Boyds"), appellants. They gave notice of their loss to State Farm Fire and Casualty Company ("State Farm"), their homeowners' insurer. They later engaged a public adjuster, The Goodman-Gable-Gould Co., d/b/a Goodman-Gable-Gould Co./Adjusters International ("GGG"), appellee, to adjust their claim with State Farm in exchange for a fee of six percent of any proceeds collected on their behalf.

Unsatisfied with GGG's services, the Boyds ultimately filed a complaint with the Maryland Insurance Administration ("MIA"), alleging that GGG, through its agents, engaged in fraudulent and dishonest practices, displayed incompetence, and wrongfully withheld monies from them. The Boyds sought over $100,000 in restitution and the return of insurance proceeds they alleged were being withheld by GGG. They also asked the MIA to impose administrative penalties on GGG.

While that complaint remained pending, the Boyds filed in the Circuit Court for Montgomery County against GGG and State Farm,[1] a complaint for declaratory judgment, the instant action, seeking a declaration that they had a legal right to terminate their contract with GGG. After the MIA completed its investigation of the administrative complaint and issued a preliminary decision in GGG's favor, the Boyds did not request an administrative hearing to contest that determination. They filed an amended complaint in the circuit court action adding claims for breach of contract, restitution, negligence, and fraud, and seeking compensatory and punitive damages.

_____

[1] The Boyds voluntarily dismissed their claim against State Farm on March 29, 2019.

GGG moved for summary judgment on the ground that the Boyds were collaterally estopped by the MIA decision from pursuing any relief and moved to strike the amended complaint. Following a hearing, the circuit court granted GGG's motions for summary judgment and to strike, concluding respectively that the Boyds were collaterally estopped by the MIA decision and that GGG suffered actual prejudice occasioned by the timing of the amendments to the complaint. The Boyds' motions for reconsideration and to alter or amend were denied.

On appeal, the Boyds present six questions,[2] which we have condensed and rephrased as two:

I. Did the trial court err by granting summary judgment in favor of GGG on the ground of collateral estoppel?

II. Did the trial court err or abuse its discretion by granting GGG's motion to strike the amended complaint?

---

[2] The questions as posed by the Boyds are:

1. Did the trial court misapply provisions of the Insurance Article concerning a request for an administrative hearing pertaining to a proposed examination report of a Maryland Insurance Administration investigation of a public adjuster to the Boyds?
2. Did the trial court commit reversible error in granting GGG's motion for summary judgment based on collateral estoppel?
3. Did the trial court deprive the Boyds of procedural due process by denying them an adjudication?
4. Did the trial court commit reversible error by striking the Amended Complaint?
5. Did the trial court commit reversible error by denying the Motion to Alter or Amend Judgment?
6. Did the trial court commit reversible error by denying the Motion for Reconsideration of the Order granting GGG's Motion to Strike?

For the following reasons, we reverse the grant of summary judgment in favor of GGG and remand for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS[3]

### A. Background

The Boyds' property, located at 14001 Gorky Drive in Potomac, was insured by State Farm under a homeowners policy. As pertinent, under "Coverage A – Dwelling," the policy provided replacement coverage for the dwelling up to $945,758 and under "Coverage A – Dwelling Extension" additional coverage up to $94,576 for "other structures on the residence premises, separated from the dwelling by clear space" and not attached to the dwelling, except by a "fence, utility line, or similar connection[.]"

On June 13, 2016, the dwelling on the Property was destroyed by a fire. An adjacent or adjoining deck constructed of Brazilian Ipé Walnut hardwood valued at $112,344 was damaged by the fire, but the Boyds believed much of the wood could be salvaged. A gazebo, driveway, and landscaping on the Property also sustained damage in the fire. The Boyds' State Farm insurance agent, Amy James, advised them that the property was a "total loss" and would exceed their policy limits.

On July 13, 2016, the Boyds contracted with GGG for it to adjust their claim with State Farm. The terms of the one-page contract were that GGG would assist the Boyds in their effort to recover for the loss to their dwelling and personal property "for a fee of six

---

[3] Because the Boyds appeal from a summary judgment, we present the underlying facts in the light most favorable to them. We note, however, that GGG disputes many of these allegations.

percent (6%) of the gross amount adjusted or otherwise recovered as a result of said claim or claims" and assist the Boyds to recover additional living expenses ("ALE") without any fee. The Boyds assigned to GGG the right to proceeds paid by State Farm up to the amount of the six percent fee. With some exceptions, GGG would bear the cost of estimates and any expert opinions necessary to support the Boyds' claim. Zachary Forrest, a GGG senior vice president, met with the Boyds to discuss their claim. He expressed the view that the deck, along with a gazebo that sustained fire damage, should be demolished and rebuilt. He advised the Boyds that they could obtain additional coverage to replace the deck and gazebo under the Dwelling Extension coverage, maximizing their coverage under the policy.

In January 2017, Forrest transmitted to State Farm the Boyds' estimates for their losses, which were prepared by a building consultant retained by GGG. The estimates exceeded the Boyds' policy limits.

On March 17, 2017, before State Farm had responded to the estimates, demolition commenced at the Property. On or about March 18, 2017, the Boyds' contractors demolished the deck. Ultimately, State Farm paid the Boyds their policy limits under Coverage A – Dwelling, but only paid about one quarter of the Dwelling Extension Coverage limits because it did not deem the deck to be an "other structure." As James explained in a March 29, 2017 letter to Forrest: "the decks on the home are not considered covered under the dwelling extension coverage and are considered part of the main structure. The dwelling extension portion of the estimate includes the walkway, driveway and fence." In the months that followed that letter, Forrest, in consultation with

the Boyds, followed up with James to clarify State Farm's position relative to the deck. In June 2017, State Farm denied coverage for the deck as a dwelling extension because it concluded that the deck was permanently attached to the dwelling *and* was not separated from the dwelling by a clear space.

By January 2018, the Boyds had retained counsel, who sent a demand letter to GGG and gave notice of the Boyds' intent to terminate their contract.

## B. The MIA complaint

On March 13, 2018, the Boyds, through counsel, filed a "Property & Casualty Complaint[]" with the MIA. On the complaint form, they designated GGG as the public adjuster against whom they were registering their complaint and Forrest as their agent. In the section provided for "BRIEF DETAILS OF YOUR COMPLAINT," the Boyds cross-referenced an attached 11-page "COMPLAINT" with 18 exhibits. The complaint detailed the Boyds' history with GGG and Forrest; the unsuccessful claim for replacement of the deck under the "Dwelling Extension" coverage; GGG's retention of insurance proceeds from State Farm; and other issues pertaining to GGG's handling of their claim. The Boyds alleged that GGG had violated section 10-410(a)(3), (4), (5) and (9) of the Insurance ("Ins.") Article,[4] authorizing the Insurance Commissioner ("Commissioner") to suspend or revoke a public adjuster's license if it violated the Insurance Article, engaged in fraud or dishonesty, demonstrated incompetency or untrustworthiness, or failed to pay money due on demand. The relief sought by the Boyds included $112,344 in restitution

---

[4] All references to the Insurance Article are to the 2017 Replacement Volume, unless otherwise indicated.

for the loss of their deck; "compensation for loss of Replacement Cost reimbursement for their personal property"; ALE they expected to incur; "additional landscaping reimbursement"; and storage fees they had incurred. They also asked the MIA to impose fines on GGG for each violation of the Insurance Article and to issue an order directing GGG to release the funds withheld from them.

On April 4, 2018, Andrew Beatty, an MIA "Insurance Investigator," wrote to GGG to inform it that it was the subject of a complaint filed by Ms. Boyd and attaching a copy of the complaint. Beatty directed GGG to provide him with a "complete copy of [its] claim file/log, including copies of all correspondence"; copies of photographs and estimates; a "list of all payments received from the insurer, and all disbursements made on the claim"; and to specifically respond to the Boyds' complaints concerning the deck damage claim, the personal property and landscaping claims, the ALE and storage claims, and the claim that GGG had not released $72,048 in proceeds to them. Beatty advised that he would review GGG's response pursuant to Ins. §§ 27-303 and 27-304 and COMAR 31.15.07.03.[5]

On May 1, 2018, GGG responded to the Boyds' complaint.

---

[5] Title 27 of the Insurance Article governs "Unfair Trade Practices and Other Prohibited Practices" and Subtitle 3 of that Title pertains to "Unfair Claim Settlement Practices" *by insurers*. *See* Ins. §§ 27-303 & 27-304 (prohibiting an "insurer, nonprofit health service plan, or health maintenance organization" from engaging in certain practices). COMAR 31.15.07.03 likewise pertains to unfair claim settlement practices *by insurers*. *See* COMAR 31.15.07.03A ("a prohibited unfair claim settlement practice occurs if an insurer commits" certain acts).

Sometime after June 7, 2018, the Boyds supplemented their complaint with the MIA by submitting a 28-page "Deck Claim Analysis."

On October 6, 2018, the Boyds, through counsel, wrote to Beatty to determine when he expected to complete his investigation and issue a decision "pursuant to COMAR 31.16.10.04."[6] The Boyds emphasized that simultaneously with the MIA Action, they were pursuing declaratory relief in the circuit court to terminate their contract with GGG and avoid any obligation to pay future commissions. By letter dated October 6, 2018, counsel for the Boyds sent a letter to the MIA investigator stating that "any ensuing hearing before the Office of Administrative Hearings will produce a ruling which could be considered binding on the Parties, it would make sense to conclude the administrative process before litigating in Circuit Court."

A little over three weeks later, in an eight-page single-spaced letter, Beatty advised the Boyds' counsel that the MIA had "completed the review of the issues raised in [their] complaint, . . . [GGG's] response . . ., the documents contained in [GGG's] file, and the documents contained in State Farm['s] . . . claim file" and had "determined that GGG's actions [were] not in violation of Maryland insurance law." The letter addressed each of the Boyds' complaints relative to the deck claim, the landscaping claim, the contents

---

[6] This regulation falls under the "Miscellaneous" Subtitle of the MIA regulations applicable to "carriers that issue or deliver insurance policies or health maintenance organization contracts in Maryland." COMAR 31.16.10.01. The specific regulation cited by the Boyds pertains to a determination following a complaint investigation. It requires the Commissioner, or his or her designee, to "document the findings of the complaint investigation in a determination letter" and provide those findings to "to the complainant and the carrier that was the subject of the complaint[.]" COMAR 31.16.10.04.

claim, and the ALE claim. Beatty explained that the MIA's review of "the propriety of GGG's handling of the claim" was circumscribed by Ins. § 10-410, which specifies the grounds for discipline of a public adjuster. Beatty focused upon four subsections that authorize the MIA to discipline a public adjuster who violates the Insurance Article; engages in fraudulent or dishonest practices; demonstrates incompetency or untrustworthiness; or misappropriates, converts, or unlawfully withholds money that belongs to an insured. Ins. § 10-410(a)(1), (3), (4) & (5). Beatty reasoned that though the Boyds were "not . . . satisfied with GGG's handling of their claim, GGG's actions ha[d] not demonstrated a lack of trustworthiness or competence or otherwise been shown to be in violation of the Insurance Article." Beatty closed by advising the Boyds' attorney:

> This determination is subject to your clients' right to a hearing pursuant to the Annotated Code of Maryland, Insurance Article, Section 2-210[7] and the Code of Maryland Regulations ("COMAR") 31.02.01.[8] To request a hearing you must do so in writing and the request must be received by the Insurance Administration within thirty (30) days of the date of this letter. Such a request shall specify the grounds to be relied upon as a basis for the relief to be demanded at a hearing. Attached please find a copy of the COMAR Regulation that addresses your right to a hearing. If a hearing is not timely requested, this determination will be final.

---

[7] Ins. § 2-210 governs hearings before the Insurance Commissioner or his or her designee, and provides, as pertinent, that the Commissioner "shall hold a hearing . . . on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner[.]" Ins. § 2-210(a)(2). Hearings are to be conducted in accordance with the contested case provisions of the Administrative Procedure Act. Ins. § 2-210(c).

[8] COMAR 31.02.01 governs contested case hearings held before the Commissioner or his or her designee, and contested case hearings delegated to the Office of Administrative Hearings.

A copy of COMAR 31.02.01.03,[9] an MIA "Hearing Request Form," and a "Consumer Questionnaire" were attached to the letter. The hearing request form was prefilled with the Boyds' attorney's name; their case number; and their attorney's address. It had blanks for the Boyds to complete explaining how they were aggrieved, the facts of their case, and what relief they were requesting from the MIA.

The Boyds did not request a hearing.

**C. The Circuit Court Proceedings**

Meanwhile, on March 29, 2018, just two weeks after the Boyds filed their MIA complaint, they filed a "Complaint for Declaratory Judgment" in the circuit court against GGG and State Farm. They sought a declaration that GGG was "contractually obliged to endorse settlement drafts issued by State Farm" for personal property losses and landscaping damage, in exchange for the Boyds' payment of the 6 percent commission on those amounts; that the Boyds had a "lawful basis" to terminate the contract with GGG; that the termination did not require GGG's written consent; that State Farm must acknowledge the termination of the contract; and that all future insurance payments must be made directly to the Boyds.

Because the Boyds sought only declaratory relief, the matter was designated "Track 0" in the circuit court's differentiated case management plan. Consequently, no scheduling order was issued, and it was set for trial on December 12, 2018.

---

[9] COMAR 31.02.01.03 pertains to all requests for hearings "except a request for a hearing on a proposed examination report."

-9-

About a week after the letter decision in the MIA Action, GGG filed an amended answer in which it asserted collateral estoppel, "claim and issue preclusion," and failure to exhaust administrative remedies as affirmative defenses. GGG maintained that the matter must be "stayed or dismissed" as a result of the MIA Case. It attached Beatty's letter and the MIA Complaint, with exhibits, to its amended answer.

GGG subsequently moved to stay or dismiss the circuit court case based upon Beatty's letter. It argued that the final adjudication in the administrative proceeding would be binding upon the parties and, thus, the circuit court case should be stayed until the MIA Action was finally decided. It further maintained that the administrative remedy was "primary" and, consequently, that the Boyds were obligated to exhaust that remedy before resorting to the circuit court.

The Boyds also moved to stay the circuit court action. They asserted that they would be requesting a hearing in the MIA Action before the Office of Administrative Hearings ("OAH") pursuant to Ins. § 2-210 and COMAR 31.02.01 and that because the hearing would be scheduled after the trial in the circuit court action, a stay was appropriate to permit the administrative proceeding to conclude prior to the trial in the circuit court. The Boyds asked the court not to stay discovery, however.

Both motions to stay were denied.

On November 26, 2018, the circuit court postponed the trial date until April 17, 2019.[10]

Over three months before trial, on January 7, 2019, the Boyds filed an amended complaint. They added 108 general factual allegations and four new counts. In Count I, they asserted that GGG breached its contract by failing to exercise reasonable diligence and due care in adjusting the Boyds' claim with State Farm and sought $417,504.37 in damages.[11] Count II requested the same declaratory relief as in the original complaint. Count III asserted a claim for restitution of the commission payments made to GGG, totaling $60,150.21, on the ground that there was no consideration supporting the contract given that State Farm already had agreed to pay the Boyds' policy limits under Coverage A. Count IV asserted a claim for negligence, premised upon statutory duties set forth in Ins. § 10-410(a), seeking the same damages as for breach of contract. Count V asserted a claim for fraud, alleging that Forrest, as agent for GGG, made willfully false representations to the Boyds relative to the potential coverage for the damaged deck and

---

[10] The trial date was continued on a motion filed by GGG on November 1, 2018, due to a scheduling conflict for its counsel.

[11] That amount comprised six categories of damages: 1) $112,344 for the value of the deck; 2) $3,771.09 for the six percent fee paid on an allegedly "inflated demolition estimate"; 3) $48,651.58 representing the difference between the amount charged by GGG's sister company for demolition and the actual cost of demolition; 4) $6,106.10 representing the difference between the amount charged for debris removal and the amount covered under the Boyds' Policy; 5) $57,480 for four months of lease payments for alternative housing and moving expenses; and 6) $189,151.60 for loss of "Option ID Inflation Coverage" occasioned by GGG's delays.

-11-

the cost of demolition. The Boyds sought $106,237.78 in compensatory damages and $300,000 in punitive damages under that count.

On January 23, 2019, GGG moved to strike the amendments to the complaint and for summary judgment. In its motion to strike, GGG asserted that it was prejudiced by the late amendments because there was insufficient time before trial to complete discovery on the new claims and because the Boyds now sought more than half a million dollars in damages, whereas the original complaint sought only declaratory relief. Further, because the Boyds had elected not to appeal from the letter determination issued by Beatty, GGG maintained that that decision was final and binding upon them, precluding the relitigation of the same claims asserted in the MIA Action.

In its motion for summary judgment,[12] GGG asserted that all the facts alleged in the amended complaint were substantively identical to those alleged in the MIA complaint and that the MIA finally determined that GGG had not violated the Insurance Article by its handling of the Boyds' claim. Citing *Garrity v. Maryland State Board of Plumbing*, 447 Md. 359 (2016), GGG argued that the Boyds were collaterally estopped from pursuing any of their claims in the circuit court.

The Boyds opposed the motions.

The court held a hearing on the motions on April 8, 2019 and ruled from the bench, granting both motions. The court reasoned that though the Boyds had not been

_____

[12] GGG subsequently filed a second motion for summary judgment addressed to the merits of each claim in the amended complaint. As we shall discuss, however, the circuit court granted summary judgment solely on the ground of collateral estoppel.

afforded a full administrative hearing before the MIA, because it was their choice not to request a hearing, they had been afforded "every opportunity to pursue their claims" administratively and were estopped from doing so in the circuit court. On the motion to strike, the court ruled that because "no new facts [were] developed in the amended complaint" and the Boyds waited until just 3 months before trial to add four counts and damages claims, GGG was prejudiced by the Boyds' late amendments. The court entered an order to that effect on April 10, 2019.

Within ten days, the Boyds moved for reconsideration of the grant of the motion to strike and to alter or amend the judgment.

The court held a hearing on the post-judgment motions and denied them. It amplified its earlier reasoning, emphasizing that Beatty made factual findings in his letter and that the Boyds were bound by those findings in light of their decision not to request an administrative hearing. It further reiterated its ruling that GGG was prejudiced by the Boyds' undue delay in amending their complaint. This timely appeal followed.

We shall include additional facts as necessary to our resolution of the issues.

**DISCUSSION**

**I.**

**Motion for Summary Judgment**

Pursuant to Maryland Rule 2-501, a trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law. "Whether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of*

*College Park*, 415 Md. 475, 498 (2010) (citations omitted). Thus, in assessing the propriety of the grant of summary judgment, we consider whether "the trial court's legal conclusions were legally correct." *Messing v. Bank of Am., N.A.*, 373 Md. 672, 684 (2003) (citations omitted).

The Boyds contend that the circuit court legally erred in ruling that their claims in the circuit court action were barred by collateral estoppel or related principles of failure to exhaust administrative remedies. Their primary position is that Beatty did not investigate an administrative complaint for the MIA, but rather conducted an "examination" of a public adjuster pursuant to Ins. § 2-206(1). They maintain that, in his capacity as an examiner, Beatty did not act in a quasi-judicial manner; that his letter was not a decision, but a "proposed examination report"; and that despite the representation in the letter that the Boyds had a right to a hearing to contest Beatty's determination that GGG did not violate the Insurance Article, they were not in fact entitled to a hearing. Rather, the Boyds assert that only GGG was entitled to a hearing had it been aggrieved by Beatty's proposed examination report.

GGG responds that the argument that Beatty's letter was a proposed examination report from which the Boyds were not entitled to appeal is without merit and, in any event, is waived because it was not advanced in the circuit court. It maintains that the circuit court correctly ruled that the Boyds were collaterally estopped from pursuing their claims in the circuit court because they elected to pursue claims premised on the same core facts before the MIA, which rendered a decision adverse to them that became final when they did not administratively appeal within 30 days. Further, GGG argues that the

-14-

administrative remedy was primary and, thus, that the Boyds were obligated to exhaust that remedy before pursuing a civil action.

**a.**

We begin by assessing the nature of the MIA Action and the Boyds' administrative rights and remedies. The Commissioner is empowered to enforce the Insurance Article by, among other things, imposing "any penalty or remedy authorized by [the] article, against a person that is under investigation for or charged with a violation of [the] article[.]" Ins. § 2-201(e). The Commissioner is authorized to conduct any investigation "necessary to fulfill the purposes of [the] article" even if not "expressly authorized." Ins. § 2-108. In conducting an investigation, examination, or hearing, the Commissioner, deputy Commissioner, or an examiner authorized by the Commissioner may administer oaths, examine persons, and issue subpoenas compelling witnesses to appear and testify or produce documents. Ins. § 2-203.

Public adjusters are regulated under Title 10, Subtitle 4 of the Insurance Article.[13] A public adjuster must be licensed to offer services in Maryland. Ins. § 10-403(a). Section 10-410 governs the suspension or revocation of the license of a public adjuster. As pertinent, the Commissioner may suspend or revoke a public adjuster's license "after notice and opportunity for a hearing under [Ins.] §§ 2-210 through 2-214 . . . if . . . the licensee" violates the Insurance Article, "engage[s] in fraudulent or dishonest practices,"

---

[13] In 2017, after the Boyds entered into their contract with GGG, the legislature significantly amended and expanded Title 10, Subtitle 4. *See* 2017 Md. Laws, ch. 106 § 1 (effective Jan. 1, 2018).

"demonstrate[s] incompetency or untrustworthiness," "misappropriate[s], convert[s], or unlawfully with[holds] money," or "fail[s] or refuse[s] to pay on demand money that belongs to an . . . insured[.]" Ins. § 10-410(a). In addition to suspension or revocation of a license, the Commissioner is empowered to impose a penalty of between $100 and $500 for each violation of the Insurance Article and to order the public adjuster to pay "restitution to any citizen who has suffered financial injury because of the violation of [the] article." Ins. § 10-410(c) & (d).

Section 2-206 governs "examinations" of insurance brokers, agents, and public adjusters. It authorizes the Commissioner to "examine the accounts, records, documents, and transactions that relate to the insurance affairs or proposed insurance affairs" of those persons or entities whenever "advisable to determine compliance" with the Insurance Article. Ins. § 2-206. An examination is conducted at the place of business of the person or entity being examined or the "place where records of the person are kept." Ins. § 2-207(a)(2). The person being examined must make available to the examiner "the accounts, records, documents, files, information, assets, and matters that are in the possession or control of the person and relate to the subject of the examination" and assist with the examination to "the extent reasonably possible." Ins. § 2-207(b). At the conclusion of an examination, the examiner prepares a proposed examination report, which contains "facts" ascertained from "the books, records, or documents of the person being examined; or . . . determined from statements of individuals about the person's affairs." Ins. § 2-209(b). The proposed examination report must be served on the person examined and if, within 30 days thereafter, that person requests a hearing, the

-16-

Commissioner shall grant the request. Ins. § 2-209(c). The proposed examination report may not be adopted until the hearing has been held. *Id*. After an examination report is adopted by the Commissioner, it may be admitted in evidence in any action brought by the Commissioner against an individual. Ins. § 2-209(d).

Ins. § 2-210 pertains to hearings. The Commissioner "may hold hearings" that he or she "considers necessary for any purpose under [the] article" and "shall hold a hearing" required by the article or "on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner, except an order to hold a hearing or an order resulting from a hearing." Ins. § 2-210(a). Hearings are governed by the contested case provisions of the Administrative Procedure Act. Ins. § 2-210(c). In holding a hearing under Title 2, Subtitle 2, the Commissioner "sits in a quasi-judicial capacity." Ins. § 2-214(a). Following a hearing, the Commissioner shall issue an order setting forth a concise statement of the facts found, the conclusions drawn from those facts, and setting forth the effective date, purpose, the grounds for the Commissioner's action, and the provisions of the article upon which he or she relied. Ins. §§ 2-214(c) & 2-204(b). As pertinent, a party aggrieved by "an order resulting from a hearing or a refusal to hold a hearing" may petition for judicial review in the circuit court. Ins. § 2-215.

The Commissioner has adopted regulations to carry out the article which appear at Title 31 of the Code of Maryland Regulations (COMAR). *See* Ins. § 2-109(a) (authorizing the Commissioner to adopt regulations). The definitions in Subtitle 2, pertaining to "Powers and Duties – Hearings," are pertinent to our analysis. An

"Administrative complaint" includes "a document that . . . [i]s received by the Commissioner from any person" that "[a]lleges a violation of . . . [a] law or regulation enforced by the Commissioner[.]" COMAR § 31.02.01.02.B(2). A contested case is defined to include a proceeding "[a]rising out of a determination made by the Commissioner," "[r]egarding a license . . .," "on a proposed examination report," or "arising out of any other act of, threatened act of, or failure to act by the Commissioner that aggrieves a person." COMAR § 31.02.01.02.B(3). A "Determination" means "a decision by the Commissioner that requires [him or her] to provide the opportunity for a hearing to a person aggrieved by the decision . . . [pursuant to Ins.] § 2-210[.]" COMAR § 31.02.01.02.B(4)(a). It includes "[a] decision as to whether a person against whom an administrative complaint has been received violated a law, regulation, or order[.]" COMAR § 31.02.01.02.B(4)(b)(i). An "Examination Report" is defined to include "a report of the examination of . . . [a] public adjuster[.]" COMAR § 31.02.01.02.B(5)(a)(ii). A "[p]roposed examination report" is the report mailed "to the person examined . . . [a]t the conclusion of an examination" that "informs the person being examined of the person's right to request a hearing pursuant to Regulation .04C[.]" COMAR 31.02.01.02.B(9).

COMAR § 31.02.01.03 "applies to all requests for a hearing except a request for a hearing on a proposed examination report." As mentioned, a copy of this regulation was appended to Beatty's letter to the Boyds. A request made under this regulation must be received by the Commissioner "within 30 days of the date of the letter notifying the party of the Commissioner's action, intention to act, or failure to act." COMAR

31.02.01.03.C(1). The request must specify the "action or non-action of the Commissioner causing the person requesting the hearing to be aggrieved[.]" COMAR 31.02.01.03.D(1).

COMAR § 31.02.01.04 governs requests for hearings on proposed examination reports. A proposed examination report must be mailed to the "person that was examined" 30 days before the proposed report is filed and must advise the person examined if the Commissioner "intends to impose a fine or other penalty or require restitution or other remedy as a result of the findings of the proposed examination report[.]" COMAR § 31.02.01.04.B. The person examined may, within 30 days of receipt of the proposed examination report, request a hearing. COMAR § 31.02.01.04.C.

In either case, once a hearing is scheduled, the parties are entitled to limited discovery by filing requests for production and by subpoenaing witnesses. COMAR §§ 31.02.01.05-1 & .06.

**b.**

We discern from the statutes and regulations set out above that the MIA Action was initiated by the Boyds' filing of an administrative complaint; that it was not an examination; that Beatty's letter was an MIA "Determination"; and that the Boyds, as parties aggrieved by that determination, were entitled to a contested case hearing, had they elected to request one. We explain.

An examination is like an audit. It may be initiated by the Commissioner to determine general compliance with the Insurance Article or specific provisions of it. It is conducted at the place of business of the person to be examined and the findings resulting

from the examination are served upon the person examined, who is entitled to an exceptions hearing, upon request, before the proposed examination report may be adopted.

In contrast to that procedure, here the Boyds filed a complaint using a complaint form available on the MIA's website. They identified a specific claim that GGG allegedly mishandled. In response to their complaint, Beatty, who identified himself as an "Insurance Investigator," not an examiner, advised GGG that a complaint had been made against them and that he was charged with investigating that complaint, and directed them to provide him with the Boyds' claim file and any related documents and correspondence. He did not come to GGG's place of business to examine its records and accounts and he did not seek records outside of the scope of the Boyds' complaint.[14] Further, at the end of Beatty's investigation, he served his letter summarizing his findings and conclusions upon the Boyds, not upon GGG.

Beatty's letter to the Boyds' counsel was "[a] decision as to whether a person against whom an administrative complaint has been received violated a law, regulation, or order[.]" COMAR 31.02.01.02.B(4). It follows that to the extent the Boyds were aggrieved by that decision, they were entitled to a hearing upon their request. COMAR 31.02.01.02.B(4); Ins. § 2-210(a)(2). This was consistent with Beatty's letter, which advised them that they could request a hearing within 30 days of their receipt of his letter

---

[14] We do not mean to suggest that an examination never could result from an administrative complaint, but only that that was not what occurred here.

and attached a copy of COMAR 31.02.01.03, which is the regulation governing hearing requests generally, not hearing requests in response to a proposed examination report.

**c.**

We now turn to the impact, if any, that the Boyds' decision to pursue an administrative complaint, but not to request a hearing after the MIA's preliminary decision, had upon their right to pursue their judicial action in the circuit court. GGG maintains that the Boyds were collaterally estopped by the MIA decision from relitigating the same issues in the circuit court or, in the alternative, that by their decision not to request a contested case hearing, they failed to exhaust their administrative remedies. We conclude that the MIA decision was not the product of a quasi-judicial proceeding and, consequently, the Boyds were not collaterally estopped by it. Further, we conclude that the administrative remedy was neither exclusive nor primary but was fully concurrent with the judicial remedy. Thus, the Boyds were not obligated to exhaust administrative remedies to pursue their judicial action. Thus, we shall reverse the circuit court's grant of GGG's motion for summary judgment.

In *Batson v. Shiflett*, 325 Md. 684, 705 (1992), the Court of Appeals held that the decision of an administrative agency may have preclusive effect if the agency decision was the product of a quasi-judicial proceeding. The Court adopted the three-part test set out by the United States Court of Appeals for the Ninth Circuit in *Exxon Corp. v. Fischer*, 807 F.2d 842, 845-46 (9th Cir. 1987), for preclusive effect of agency decisions.

> That test provides that an agency decision can have preclusive effect if: (1) the agency acted in a judicial capacity; (2) the issue presented to the fact

finder in the second proceeding was fully litigated before the agency; and (3) resolution of the issue was necessary to the agency's decision.

*Garrity*, 447 Md. at 380 (citing *Batson*, 325 Md. at 701). If the test is satisfied, "agency findings made in the course of proceedings that are judicial in nature should be given the same preclusive effect as findings made by a court." *Batson*, 325 Md. at 702.

Applying that test, GGG asserts that the MIA "convened a 'contested hearing', in which the Boyds were called upon to prove their assertions and GG[G] was called upon to contest those assertions." Ins. § 2-214(a) makes plain, however, that the Commissioner acts in a quasi-judicial manner when holding a hearing pursuant to Ins. § 2-210. As discussed, though the Boyds were entitled to a hearing under Ins. § 2-210 following the MIA's determination that GGG had not violated the Insurance Article by its handling of their claim, a hearing as that term is used in the Insurance Article had not yet occurred. *See* COMAR 31.02.01.02.B(4) (defining "Determination" to mean "a decision by the Commissioner *that requires the Commissioner to provide the opportunity for a hearing to a person aggrieved* by the decision under Insurance Article §2-210") (emphasis added). Likewise, the administrative complaint submitted by the Boyds, though contested by GGG, did not become a "contested case" until the determination was made that aggrieved either the Boyds or GGG. *See* COMAR 31.02.01.02.B(3) (defining "Contested Case" to include a proceeding *"[a]rising out of* a determination made by the Commissioner" or "any other act of, threatened act of, or failure to act by the Commissioner that aggrieves a person") (emphasis added). Because the Insurance Article specifies when the Commissioner acts in a quasi-judicial manner and that the investigation of an

administrative complaint precedes the exercise of those powers, we conclude that the investigation of the Boyds' complaint resulting in the preliminary agency decision was not a quasi-judicial proceeding.

Our conclusion is bolstered by the fact the Boyds did not participate in an adversarial hearing prior to the decision. GGG's analogy to *Garrity* in this regard is misplaced. In that case, the Court of Appeals held that the Consumer Protection Division's ("CPD") final decision that a plumber violated the Consumer Protection Act, imposing fines, and ordering him to pay restitution, had preclusive effect in a second administrative proceeding brought against the same plumber by his licensing board to revoke his license and impose additional penalties. There, the CPD's decision had followed a two-day administrative hearing before an Administrative Law Judge at the Office of Administrative Hearings. In this case, in contrast, there was no oral hearing; none of the parties testified, called witnesses, or cross-examined adverse parties; and Beatty did not make credibility determinations in assessing the parties' competing positions.

GGG nevertheless maintains, citing *Alitalia Linee Aeree Italiane v. Tornillo*, 320 Md. 192 (1990),[15] that Beatty conducted a "paper hearing." Even if the investigation may

---

[15] In *Alitalia*, 320 Md. at 192, the Court of Appeals considered whether a motion for rehearing filed by an employer before the Workers Compensation Commission must have been preceded by an oral, adversarial hearing to be effective. The employee, Tornillo, had filed a claim form alleging that he suffered an accidental injury arising out of his employment. Alitalia did not request a hearing within the requisite time and the Commission made an award based upon the evidence in the record, *i.e.*, the claim form. Thereafter, Alitalia moved to strike the award and/or for a rehearing. The Commission

(continued…)

have amounted to a "paper hearing" as that term has been defined in our case law and satisfied the Boyds' and GGG's due process rights at that preliminary stage of the agency review, it does not follow that it was a quasi-judicial proceeding for purposes of collateral estoppel. For the reasons already discussed, we conclude that it was not. Given this conclusion, the three-part *Exxon* test is not satisfied here, and collateral estoppel does not apply. Consequently, we need not assess whether the the issues presented by the Boyds in the circuit court action were "fully litigated before the [MIA]" or whether "resolution of th[ose] issues was necessary to the [MIA's] decision." *Garrity*, 447 Md. at 380.

**d.**

We turn to the alternative basis offered by GGG for affirmance of the grant of summary judgment: that the Boyds were obligated to exhaust administrative remedies before pursuing relief in the circuit court. "Whenever the Legislature provides an administrative and judicial review remedy for a particular matter or matters, the

---

(…continued)

denied the motion. On judicial review, Tornillo argued that the petition was untimely because it was filed more than thirty days after the award of compensation and that the petition for rehearing had not tolled the time to appeal because no hearing ever had been held. The circuit court agreed and entered judgment in favor of Tornillo. This Court affirmed that judgment.

In the Court of Appeals, it characterized the issue before it as "whether the word 'hearing' must be strictly limited to a proceeding at which counsel or parties in fact are heard – or at least have the opportunity to be heard: *i.e.*, to present evidence and to make oral presentations to the tribunal." *Id*. at 197. It reasoned that the history of the Worker's Compensation statute at issue supported the view that a motion for rehearing operated like a motion for reconsideration. The Court further opined: "No violence is done to the meaning of 'hearing' by reading it as extending to something other than an oral presentation before the tribunal. We have recognized the concept of a 'paper hearing.'" *Id*. at 199 (citing *Phillips v. Venker*, 316 Md. 212, 218, 221-222 (1989) (additional citations omitted)).

-24-

relationship between that administrative remedy and a possible alternative judicial remedy will ordinarily fall into one of three categories." *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 60 (1998).

> *First*, the administrative remedy may be exclusive, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.
> *Second*, the administrative remedy may be primary but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.
> *Third*, the administrative remedy and the alternative judicial remedy may be fully concurrent, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy.

*Id*. at 60-61 (citations omitted) (emphasis in original).

"Whether a plaintiff must exhaust administrative remedies prior to bringing suit is a legal issue which [we] review[] *de novo*." *United Ins. Co. of Am. v. Md. Ins. Admin*., 450 Md. 1, 14 (2016). We determine whether an administrative remedy is exclusive, primary, or concurrent by assessing the legislative intent. *Zappone*, 349 Md. at 61. If the legislature expressly states that an administrative remedy is intended to be exclusive, primary, or concurrent, then a reviewing court need not examine other factors to discern the legislature's intent. *Id*. On the other hand, "[i]n the absence of specific statutory language indicating the type of administrative remedy, there is a rebuttable presumption that an administrative remedy was intended to be primary. Thus, 'a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy.'" *United Ins*., 450 Md. at 15 (citing *Zappone*, 349 Md. at 63).

GGG does not contend that the MIA's jurisdiction was exclusive but argues that the MIA's jurisdiction was primary and, thus, the Boyds, were obligated to pursue that forum to "a hearing or a final decision" before pursuing judicial relief. The Boyds respond that the circuit court's jurisdiction was fully concurrent with the MIA's jurisdiction with respect to their claims. In any event, to the extent they were required to exhaust administrative remedies, they did so by pursuing an MIA complaint but then "electing not to pursue a hearing before the OAH[,]" thereby "terminat[ing] the administrative process" and rendering Beatty's letter determination final with respect to their administrative remedies.

Title 10, Subtitle 4 of the Insurance Article does not express a legislative intent to grant the MIA exclusive jurisdiction over a complaint against a public adjuster for breach of contract, negligence, fraud, and related claims. We thus turn to whether the presumption that the MIA had primary jurisdiction over those claims was rebutted here.

In *Zappone*, the Court of Appeals held that the presumption of primary jurisdiction was rebutted in a judicial action brought by an insured against an insurer and an insurance agent for alleged acts of fraud, negligent misrepresentation, and negligence. 349 Md. at 50. Those claims arose from allegations that Liberty Life and its agents had misrepresented the benefits and the tax consequences of a life insurance policy that Zappone purchased. On appeal from the dismissal of Zappone's judicial action for failure to exhaust administrative remedies, the Court of Appeals rejected the argument that Zappone was obligated first to exhaust his remedies under the Unfair Trade Practices title of the Insurance Article.

In so holding, the Court explained that four factors were germane to the determination of whether the presumption of a primary remedy has been rebutted: 1) "the comprehensiveness of the administrative remedy"; 2) "the administrative agency's view of its own jurisdiction"; 3) the claim's "dependen[ce] upon the statutory scheme which also contains the administrative remedy"; and 4) the claim's dependence "upon the expertise of the administrative agency." *Id*. at 64-65. It concluded that all four factors weighed against the MIA having primary jurisdiction. The Court reasoned that Zappone set forth "recognized common law causes of action" that were "wholly independent of the Insurance Code's Unfair Trade Practices subtitle." *Id*. at 67. The Insurance Commissioner, who had filed an *amicus* brief supporting Zappone's position, did not view its jurisdiction to be primary. *Id*. at 67-68. Further, the Unfair Trade Practices title expressly stated that an order issued by the Commissioner under the title did not relieve an insurer of other liability, reflecting an intent to permit alternative judicial relief.

The Court reached a similar result in *Mardirossian v. Paul Revere Life Insurance Co*., 376 Md. 640 (2003). Mardirossian, like the Boyds here, initially filed an administrative complaint against Paul Revere, alleging that it had wrongfully failed to issue a disability insurance policy to him, based upon an oral contract to issue that policy. The MIA investigator charged with investigating his complaint consulted with the MIA's chief enforcement officer, who determined that the complaint should not be pursued because it would be inappropriate to hold an insurance company responsible for not issuing a disability policy based upon an agent's representation to a broker. The investigator advised Mardirossian of this "preliminary finding" and Mardirossian "did not

pursue the administrative complaint to a higher level within the MIA." *Id*. at 645. In a footnote, the Court emphasized that Mardirossian was entitled to an adversarial hearing to contest the MIA investigator's preliminary finding not to pursue his complaint. *Id*. at 645, n.2.

Mardirossian then filed a complaint in the circuit court seeking specific performance of the oral contract. That case was removed to the United States District Court for the District of Maryland, which ruled that the administrative remedies were exclusive and primary and Mardirossian was obligated to exhaust them before pursuing the specific performance claim. On appeal, the Fourth Circuit Court of Appeals vacated that judgment and remanded to the district court with instructions to certify the issue of whether the Insurance Article created a primary administrative remedy, supplanting Maryland's common law contract remedy, to the Court of Appeals.

In deciding that certified question, the Court of Appeals, relying on *Zappone*, reasoned that an action for specific performance to enforce an oral contract for insurance was well-established in Maryland law and that the Unfair and Deceptive Trade Practices subtitle of the Insurance Code did not evidence an intent to supplant that remedy. It concluded that the legislature "did not intend that the Insurance Commissioner's authority, to restrain unfair practices [would] modif[y] Maryland['s] common law contract enforceability principles." *Id*. at 649. The Court determined that the remedies available under the Insurance Code were neither exclusive nor primary and that the "common law contract remedy [was] fully concurrent, and may be pursued in court

without exhausting the administrative remedy[.]" *Id*. Of significance, Mardirossian, like the Boyds, elected not to appeal from the MIA's adverse finding against him.

Conversely, in cases involving claims that arise out of violations of the Insurance Article, the Court of Appeals has held that the administrative remedy is primary and must be exhausted before adjudication of a judicial action. In *Carter v. Huntington Title & Escrow, LLC*, 420 Md. 605, 609 (2011), Maurice Carter filed in the circuit court a putative class action suit on behalf of himself and similarly situated persons, claiming that a title insurer overcharged them on title insurance during loan refinance transactions in violation of the Unfair Trade Practices Title of the Insurance Article. He also asserted claims for "money had and received" and for "negligent misrepresentation." *Id*. at 610-11. In support of his claims, Carter relied upon provisions of the Insurance Article requiring title insurers to file their rates with the MIA and not deviate from those rates once approved. *Id*. at 611. The title insurer moved to dismiss the complaint, arguing that the MIA had primary jurisdiction over Carter's claims. The circuit court granted the motion to dismiss and Carter's appeal from that ruling reached the Court of Appeals.

Distinguishing *Zappone* and *Mardirossian*, the Court observed that in those cases, the "behavior of the defendants violated the Insurance Article" but the "consumers possessed a 'recognized independent tort remedy' and a 'common law contract remedy,' respectively, and therefore could seek relief outside the administrative regulatory scheme." *Id*. at 626. In contrast, Carter's claims alleged "purely statutory violations." *Id*.

Analysis of the four factors enunciated in *Zappone* weighed in favor of the primacy of the administrative remedy. The Insurance Article reflected a legislative intent

to create a "comprehensive, if not complex, regulatory and remedial scheme[.]" *Id*. at 627. The Court framed the question as whether that scheme was "sufficiently comprehensive" to reflect an intent for a claim like Carter's to proceed first administratively. *Id*. Given that Carter's claims alleged and "depend[ed] on a statutory benchmark violation," though recast as common law claims, the Court concluded that it did. *Id*. at 628. Under the second factor, the Court pointed out that in another case involving a violation of a statutory obligation under the Insurance Article, the Insurance Commissioner had filed an *amicus* brief taking the position that the MIA had primary jurisdiction. Under the third factor, the Court reasoned that Carter's claims would not exist "without an essential underpinning found in the Insurance Article." *Id*. at 630. The fourth factor did not weigh strongly either way. Overall, the Court held that primary jurisdiction vested with the MIA and that Carter was obligated to first exhaust his administrative remedies.

Likewise, in *United Insurance*, the Court held that an insurer was obligated to exhaust its right to an administrative hearing under Ins. § 2-210 before it could seek declaratory relief in the circuit court against the MIA to challenge the Commissioner's stated intent to give retroactive effect to a newly enacted statute governing life insurance policies. Citing *Carter*, the Court emphasized the overall breadth of the Insurance Article's remedial scheme and, specifically, that United Insurance's claim for declaratory relief turned upon the Commissioner's interpretation and application of a statute it was tasked with enforcing. 450 Md. at 17-18. It emphasized that the MIA, which had successfully moved to dismiss the declaratory judgment action in the circuit court, clearly

-30-

viewed its jurisdiction over the claim as primary. *Id*. at 22. Under the third *Zappone* factor, the Court held that the insurer's claims were dependent upon the statutory scheme because the enactment of the statute and the Commissioner's threat to enforce the statute retroactively formed the basis for claim for declaratory relief. Finally, it was appropriate to accord deference to the MIA, in the first instance, to pass upon the issue of retroactive application of the statute. *Id.* at 27.

We return to the instant case. As in *Zappone* and *Mardirossian*, assessment of the relevant factors weighs in favor of concurrent jurisdiction over the Boyds' claims. Though the Unfair Trade Practices title of the Insurance Article creates a comprehensive remedial scheme, the regulation of a public adjuster under Title 10, Subtitle 4 in effect at the time of the acts giving rise to the Boyds' complaint was much more limited in scope.[16] It regulated the licensure of a public adjuster and granted the Commissioner discretion to award restitution for financial harm. The MIA has not participated in this case and, thus, we cannot gauge its view of its jurisdiction under these facts. Of great

---

[16] As noted earlier, after the contract and the events in this case giving rise to the Boyds' claims against GGG, the legislature amended and expanded Title 10, Subtitle 4. *See* 2017 Md. Laws, ch. 106 § 1 (effective Jan. 1, 2018). Section 10-411 now prescribes the form of a contract for public adjuster services. Section 10-412 requires public adjusters to deposit funds held on behalf of an insured in a non-interest-bearing escrow or trust account. Section 10-413 obligates a public adjuster to maintain certain records. Section 10-414 sets out the standards of conduct and obligations of a public adjuster. Section 10-415 sets forth a public adjuster's ethical obligations. Section 10-416 requires a public adjuster to report to the Commissioner any final administrative action taken against it in another jurisdiction. We express no opinion as to whether those statutes, which do not apply here, might evince an intent to create a primary or exclusive administrative remedy in future cases.

significance, the counts in the Boyds' amended complaint against GGG allege traditional common law claims for breach of contract, fraud, and negligence that are almost entirely independent of any violation of the Insurance Article.[17] The Boyds' count in which restitution is claimed for the commission charged by GGG rests upon an alleged lack of consideration, not upon a statutory violation. The Boyds' declaratory judgment count seeking a declaration that they have a right to terminate the contract also does not depend upon interpretation of any provision of the Insurance Article, but upon construction of the Boyds' contract with GGG. For these reasons, we conclude that, as *Zappone* and *Mardirossian*, Title 10, Subtitle 4 of the Insurance Article does not reflect an intent to supplant the common law remedies for breach of contract, fraud, negligence, the equitable remedy of restitution, or the statutory relief available under the declaratory judgment act, by regulating the licensure of public adjusters.

Further, as in *Mardirossian*, the Boyds' decision not to pursue a contested case hearing to challenge the preliminary determination against them did not preclude them from pursuing alternative judicial relief. *See also Thompson v. State Farm Mutual Automobile Insurance Co*., 196 Md. App. 235, 248 (2010) (reasoning that a party who pursues an administrative complaint before the MIA and receives an adverse preliminary decision after a paper hearing, but elects not to request a contested case hearing before the OAH, may not then seek judicial review of that decision, but may pursue an

---

[17] The Boyds make one reference to the Insurance Article in the amended complaint. In their negligence count, they allege that GGG's duty of care arose under Ins. § 10-410(a)(4), (5) and (9).

independent action before the circuit court, assuming that independent statutory, common law, or equitable remedies exist). Rather, by electing not to pursue that hearing, the Boyds terminated their concurrent administrative proceeding in favor of their judicial proceeding. This was their prerogative.

We recognize that there is an asymmetry to GGG in this result. Had the MIA's preliminary decision been favorable to the Boyds, GGG could have faced suspension or revocation of its license, fines, and/or an order to pay restitution. Thus, GGG would have been obligated to request a contested case hearing to avoid those adverse outcomes. Given that the MIA regulates insurers and insurance professionals, not insureds, and the fact that the MIA could not have given full relief to the Boyds, even if warranted, our construction of the administrative scheme is not unreasonable or unfair.

## II.

### Motion to Strike Amended Complaint

Given our resolution of the first issue, we conclude that the court erred in granting the motion to strike the amended complaint for the reason given. The court's reasoning in ruling on the motion to strike was intertwined with the ruling on summary judgment. It emphasized in granting that motion that GGG was prejudiced by the Boyds' decision to pursue two avenues for relief simultaneously and that striking the amendments was not unfair to the Boyds because they had been given an opportunity to litigate their claims before the MIA but elected not to pursue a hearing. As already explained, however, the Boyds were permitted to pursue both their administrative and judicial remedies and to terminate their administrative complaint in favor of the pending judicial action. Any

prejudice to GGG occasioned by the timing of the amendments to the complaint relative to the then scheduled trial date are moot given that on remand, a new trial date will be scheduled.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.**
